**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**William KUDER, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 6, 2012.
Filed Feb. 25, 2013.

Frank M. Spina, II, Wilton Manors, FL, for appellant.

David W. Heckler, District Attorney, Doylestown, for Commonwealth, appellee.

BEFORE: SHOGAN, J., WECHT, J., and STRASSBURGER, J.*

OPINION BY WECHT, J.

William Kuder ("Appellant") appeals from the September 16, 2011 judgment of sentence entered by the Court of Common Pleas of Bucks County. We affirm.

The trial court provides a succinct introduction of the case:

* Retired Senior Judge assigned to the Superior Court.

Appellant was a 49[-]year[-]old male who both resided in Chalfont Borough, Bucks County, and served as a Councilman on the Chalfont Borough Council. He also served as a little league baseball coach and was deeply involved in all manner of community activities of a civic, religious and business nature. He was the owner and president of a computer security company and was a close personal family friend of the parents of [K.P.]. Appellant and [K.P.'s] family went on vacations together and frequently visited each other's home[s], where Appellant became so closely affiliated with [K.P.] that Appellant was referred to as [K.P.'s] "uncle." Appellant had no prior criminal history of any nature and had never heretofore been arrested for any offense. In short, Appellant had earned the trust and unquestioned friendship and respect of the entire family and thereby gained unfettered access to the then 12[-]year[-]old [K.P.].

Trial Court Opinion ("T.C.O."), 1/17/2012, at 2–3.

Our detailed review of the record herein reveals the following history. Prior to June 2002, Appellant had developed a close relationship with K.P., a twelve-year-old boy at the time, and K.P.'s family, who lived on the same street as Appellant in Chalfont, Pennsylvania. On a Monday afternoon in June 2002, K.P. went to Appellant's house to help Appellant work on a computer, an activity in which K.P. had demonstrated an interest. When K.P. arrived at the house, Appellant's wife and toddler were present in the home. K.P. and Appellant proceeded down into the basement, where Appellant ran his computer security business. The pair immediately commenced replacing the motherboard of a computer.

After a few minutes, and without warning, Appellant lifted K.P. onto his lap and fondled K.P.'s penis. Appellant then removed K.P.'s pants and started to masturbate K.P. As this was occurring, Appellant assured K.P. that the physical contact was proper, as it was preparing him for future relationships with women. K.P. attempted to get free from Appellant's grasp, initially to no avail. However, after a few minutes, Appellant released K.P. and took down his own pants. With his pants removed and his penis exposed, Appellant then asked K.P. to masturbate him. K.P. briefly touched Appellant's penis, but then retreated to a corner of the basement and began playing a computer game. Undeterred, Appellant approached K.P. while he was playing the game, put K.P. on his lap and removed K.P.'s pants, and once again started masturbating K.P. While this was occurring, K.P.'s mother called and informed Appellant's wife that K.P. had to leave to go to a meeting. The fondling ended when Appellant's wife came to the top of the stairs and yelled to K.P. that his mother called and that he had to leave to get ready for the meeting.

K.P. did not tell anyone about the incidents that occurred in Appellant's basement. K.P. declined Appellant's next invitation to return to the basement. K.P.'s refusal of Appellant's invitation angered Appellant to such an extent that Appellant told K.P. that "[i]f you were an adult, I would have beat you for standing up to me like that." Notes of Testimony ("N.T."), 6/1/2011, at 50. To avert Appellant's anger, K.P. reluctantly returned to Appellant's house, again on the pretext of helping Appellant work on a computer. Once K.P. was in the basement, Appellant mentioned the amount of pubic hair that K.P. had on his body. Even though this made K.P. uncomfortable, K.P. nonetheless remained in the basement and began working on one of the damaged computers. Appellant then pulled down K.P.'s pants

and asked if he could perform oral sex on K.P. Appellant lowered himself to his knees and tried to place his mouth on K.P.'s penis. K.P. estimated that Appellant got within one eighth of an inch of K.P.'s penis before K.P. pulled away from Appellant. In response, Appellant removed his own pants and asked K.P. to perform oral sex on him. K.P. refused the request, and walked away from Appellant.

K.P. walked to another portion of the basement and began playing a computer game. Appellant followed K.P., picked K.P. up, sat K.P. on his lap, and again removed K.P.'s pants. As in the previous incident, Appellant started to masturbate K.P. Again, the sexual assault terminated only because K.P.'s mother called Appellant's house and requested that K.P. return home. Appellant's wife received the call and yelled for K.P. from the top of the steps. From that day forward, K.P. never went back to Appellant's house alone.

K.P. did not tell anyone that this abuse occurred until 2010, when K.P. learned that his girlfriend also was the victim of sexual abuse as a child. K.P. informed his girlfriend first, and then his sister and his father. Soon thereafter, the police were contacted. K.P. met with two detectives, who requested that he wear a recording device and attempt to obtain a confession from Appellant. After K.P. agreed to wear the recording device, K.P. and one of the detectives met with an assistant district attorney. The prosecutor thereafter sought and obtained a court order authorizing the wire interception. *See* Order Authorizing the Consensual Interception of Oral Communication in Home, 6/11/2010.

On June 11, 2010, after being equipped with a recording device, K.P. drove to Appellant's home and initiated a conversation with Appellant. The conversation was social and casual at first. Eventually, however, K.P. confronted Appellant about the sexual assaults that occurred in 2002. Appellant never denied that the incidents occurred. To the contrary, Appellant admitted that he had clear memories of the events. Rather than repudiate K.P.'s allegations, Appellant expressed sorrow and mortification for his illicit behaviors. Appellant apologized for causing K.P. pain and begged for K.P.'s forgiveness. The audiotape of this conversation was played for the jury at trial.

Appellant thereafter was arrested and charged with one count of attempted involuntary deviate sexual intercourse ("IDSI") of a person under the age of 16,[1] two counts of indecent assault of a person under the age of 16,[2] and two counts of indecent exposure.[3] On September 23, 2010, Appellant filed a suppression motion challenging, *inter alia,* the existence of probable cause to support the authorization of the interception, the voluntariness of K.P.'s consent to wear the wire, and the accuracy of the facts contained in the affidavit offered in support of the wire authorization. On March 28, 2011, the trial court conducted a hearing. On May 6, 2011, that court denied Appellant's suppression motion.

At trial, the Commonwealth presented, *inter alia,* the facts substantially as presented above. Appellant testified in his own defense and denied the allegations *in toto.* Appellant conceded that he was the person on the recording speaking with K.P., but Appellant claimed that he uttered the statements of apology and remorse only because he believed that K.P. was armed. Appellant stated that he be-

1. 18 Pa.C.S. §§ 901, 3123(a)(7).

2. 18 Pa.C.S. § 3126(a)(8).

3. 18 Pa.C.S. § 3127.

lieved that K.P. fabricated the allegations because, when K.P. was twelve-years-old, K.P. admitted that he became aroused around Appellant, and Appellant abandoned K.P. instead of helping him work through that particular problem.

On June 3, 2011, having apparently rejected Appellant's testimony, the jury found him guilty of all charges. On September 16, 2011, Appellant was sentenced to three to ten years' imprisonment on the attempted IDSI count. No further penalty was imposed on any of the other counts. On October 6, 2011, Appellant filed a notice of appeal. The following day, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On December 1, 2011, following one extension and the production of trial transcripts, Appellant filed a timely statement.

Appellant raises the following six issues for our review:

1. Did the trial court err in denying [Appellant's] pre-trial motion to suppress/preclude the admission of electronic interceptions of oral communication, pursuant to the Wiretapping and Electronic Surveillance Act, where the interception occurred in the home of the non-consenting party, and, the affidavit of probable cause failed to establish probable cause that conversations concerning the criminal conduct being investigated were likely to be discussed and intercepted?

2. Did the trial court err in permitting [Appellant] to be cross-examined regarding his post[-]arrest silence to police, in contravention of his Pennsylvania and United States Constitutional right against self-incrimination?

3. Did the trial court err in permitting the Commonwealth to call witness Kim Disciullo, in rebuttal, to recount statements made to her by [Appellant] relative to a "conspiracy," where it was the trial court which erred in permitting the Commonwealth to cross-examine [Appellant] about this "conspiracy," and it was irrelevant, immaterial, and collateral, and therefore not proper rebuttal evidence?

4. Did the trial court err in admitting double hearsay when it permitted [V.P.] to testify before the jury as to the content of an out of court statement[, i.e.,] a telephone conversation she had with Karen Kuder ( [Appellant's] wife) during which Mrs. Kuder related what [Appellant] had told her about being angry with [K.P.]?

5. Did the trial court err in admitting hearsay when it permitted Detective Thiel to testify before the jury as to the content of an out of court conversation he had with [V.P.,] during which she related an incident witnessing [Appellant] yelling at [K.P.]?

6. Did the trial court err in permitting the Commonwealth to cross-examine defense character witnesses David Black and Allen Lockard, relative to their personal opinions regarding [Appellant's] character, then impermissibly presenting them with hypothetical questions, all of which was impermissible cross-examination of reputation character witnesses?

Brief for Appellant at 2–3 (some capitalization modified for clarity and consistency).

In his first issue, Appellant contends that the Commonwealth failed to establish probable cause to support the trial court's Order Authorizing the Consensual Interception of Oral Communications in Home pursuant to the Wiretapping and Electronic Surveillance Control Act ("Wiretap Act"

or "the Act"), 18 Pa.C.S. §§ 5701, *et seq.* Our standard of review in assessing the denial of a suppression motion is well-settled:

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Commonwealth v. Williams,* 941 A.2d 14, 26–27 (Pa.Super.2008) (*en banc*) (internal citations and quotations omitted).

Generally, the Wiretap Act prohibits the interception, disclosure, or use of any wire, electronic, or oral communication. 18 Pa. C.S. § 5703. The Act places great emphasis on the protection of privacy interests inherent in one's communications. *See generally Commonwealth v. De Marco,* 396 Pa.Super. 357, 578 A.2d 942, 949 (1990). Relevant to the instant case, the Act provides as follows:

### § 5704. Exceptions to prohibition of interception and disclosure of communications.

It shall not be unlawful and no prior court approval shall be required under this chapter for:

\* \* \*

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire, electronic or oral communication involving suspected criminal activities, including, but not limited to, the crimes enumerated in section 5708 (relating to order authorizing interception of wire, electronic or oral communications), where:

\* \* \*

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this paragraph shall be made unless the Attorney General or deputy attorney general designated in writing by the Attorney General, or the district attorney, or an assistant district attorney designated in writing by the district attorney, of the county wherein the interception is to be made, has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however, such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney, or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom;

\* \* \*

(iv) the requirements of this subparagraph are met. If an oral interception otherwise authorized under this paragraph will take place in the home of a nonconsenting party, then, in addition to the requirements of subparagraph (ii), the interception shall not be conducted until an order is first obtained from the president judge, or his designee who also shall be a judge, of a court of common pleas, authorizing such in-home interception, based upon an affidavit by an investigative or law enforcement officer that establishes probable cause for the issuance of such an order. No such order or affidavit shall be required where probable cause and exigent circumstances exist. For the purposes of this paragraph, an oral interception shall

be deemed to take place in the home of a nonconsenting party only if both the consenting and nonconsenting parties are physically present in the home at the time of the interception.

18 Pa.C.S. § 5704. The Act defines the term "home" as: "The residence of a nonconsenting party to an interception, provided that access to the residence is not generally permitted to members of the public and the party has a reasonable expectation of privacy in the residence under the circumstances." 18 Pa.C.S. § 5702.

Consistent with Pennsylvania's emphasis on privacy, when a violation of a provision of the Act occurs, the Act provides a statutory exclusionary rule that extends to nonconstitutional violations. 18 Pa.C.S. § 5721.1(b); *Commonwealth v. Spangler*, 570 Pa. 226, 809 A.2d 234, 238 (2002). To seek suppression of evidence resulting from a violation of the Act, a person must meet the initial threshold of demonstrating that he is an "aggrieved person" whose privacy is protected under the Act. 18 Pa.C.S. § 5721.1(b). The Act defines an "aggrieved person" as "[a] person who was a party to any intercepted wire, electronic or oral communication or a person against whom the interception was directed." 18 Pa.C.S. § 5702.

■ There is no doubt that Appellant is an aggrieved person for purposes of the Act. While Appellant meets that threshold inquiry, we still must determine whether sufficient probable cause was offered to support the interception. Before we reach that inquiry, Appellant must first demonstrate that he had an expectation of privacy in the conversation. "[T]he Act requires that a person uttering an oral communication, as that term is defined under the Act, must have a specific expectation that the contents of a discussion will not be electronically recorded." *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d

287, 288 (1994). "[T]his expectation must be justifiable under the existing circumstances. Implicit in any discussion of an expectation that a communication will not be recorded, is a discussion of the right to privacy." *Id.*

■ "To determine whether one's activities fall within the right of privacy, we must examine: first, whether [Appellant] has exhibited an expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." *Id.* at 288–89. "To satisfy the first requirement, the individual must demonstrate that he sought to preserve something as private. To satisfy the second, the individual's expectation must be justifiable under the circumstances." *Commonwealth v. Moore*, 928 A.2d 1092, 1098 (Pa.Super.2007).

The Commonwealth points out that Appellant testified at trial that he knew that his conversation with K.P. was being recorded. In light of this testimony, according to the Commonwealth, Appellant cannot demonstrate that he had a justifiable expectation of privacy in that conversation. Brief for Commonwealth at 17–18. The trial court reached the same conclusion. T.C.O. at 7. It is imperative to note here that, "[w]hen reviewing the trial court's ruling on a motion to suppress, we may consider the evidence presented both at the suppression hearing and at trial." *Commonwealth v. Douglass*, 701 A.2d 1376, 1378 (Pa.Super.1997); *see also Commonwealth v. Chacko*, 500 Pa. 571, 459 A.2d 311, 317 n. 5 (1983) ("[I]t is appropriate to consider all of the testimony, not just the testimony presented at the suppression hearing, in determining when evidence was properly admitted."); *Commonwealth v. Carr*, 292 Pa.Super. 137, 436 A.2d 1189, 1191 (1981) ("An appellate court should be able to consider all the testimony on the record to determine whether

certain evidence was constitutionally admissible at trial, not just the testimony at the suppression hearing." (citation and quotation marks omitted)).

We differ with the Commonwealth's characterization of Appellant's testimony, and we therefore disagree with its argument. At trial, Appellant testified that, during the conversation, he believed that K.P. had a gun, which caused him to fear for his own safety. Appellant specifically stated that, at the time the conversation occurred, he "had no reason to believe that [K.P.] had gone to the police or was wired." N.T., 6/2/2011, at 151. It was only after the conversation with K.P. that Appellant told his wife that he believed that K.P. "either had a gun or was wired." N.T., 6/2/2011, at 151. Appellant also told Kim Disciullo, a social worker with the Bucks County Children and Youth Agency who testified at trial, that he knew that K.P. recorded the conversation. N.T., 6/2/2011, at 243. Yet, this too appears to have been a conclusion reached after reflecting upon the conversation. On cross-examination, Appellant testified that he did not finally "connect the dots" and realize that K.P. wore a wire until the police arrived at his house to arrest him. N.T., 6/2/2011, at 177–78. There is no evidence in the record that Appellant actually knew or believed that he was being recorded at the time the conversation occurred. For this reason, we reject the Commonwealth's argument.

Appellant had a private conversation with K.P. inside Appellant's home. During that conversation, Appellant's wife, son, and father-in-law entered the portion of the residence where the conversation was occurring. Appellant asked each of them to leave so that he could continue the discussion with K.P. We conclude that these facts demonstrate both that Appellant had an expectation of privacy in the conversation, and that it is an expectation that society would deem to be justifiable.

■ We next examine whether the interception authorization order was supported by probable cause. Section 5710 of the Act authorizes a judge, upon application, to enter an order permitting the interception of a communication when there is probable cause to believe that six conditions exist. 18 Pa.C.S. § 5710(a)(1–6). One such condition is that probable cause exists to believe that "particular communications concerning [an offense described in section 5708] may be obtained through such interception." 18 Pa.C.S. § 5710(a)(2). Although Appellant does not specifically cite this section, his argument centers on the alleged lack of probable cause to believe that Appellant would discuss any past criminal activity, if approached by K.P., especially because the conversation would occur eight years after the crimes were alleged to have occurred. Brief for Appellant at 15–16 ("There were simply no facts or circumstances, set out in the Affidavit of Probable Cause herein … from which it could reasonably be concluded that there was probable cause to believe that sending [K.P], unannounced and 8 years later, to [Appellant's] house would result in a conversation about 'suspected criminal activity.'").

Both Appellant and the Commonwealth cite *Commonwealth v. McMillan*, 13 A.3d 521 (Pa.Super.2011). Appellant attempts to distinguish the case, while the Commonwealth argues that it controls the instant matter.

In *McMillan*, the appellant challenged the trial court's refusal to suppress evidence obtained pursuant to the Wiretap Act. The evidence was used to convict the appellant of various sex-related crimes. The appellant was a high school choir director who engaged in an inappropriate sexual relationship with the victim, a

fourteen-year-old girl. *Id.* at 522. The abuse commenced in 2004, and ended in 2006 when rumors began to spread about the illicit relationship. *Id.* at 523. After being repeatedly pressured by her aunt, the victim eventually admitted to the relationship. In May 2008, after facially complying with all of the Act's application requirements, law enforcement officers obtained approval to intercept a phone conversation between the appellant and the victim, who consented to the interception. We described the phone conversation as follows:

> After [the victim] indicated she was upset about the rumors circulating about their sexual encounters, she asked [the appellant] if he had told anyone about them. [The appellant] repeatedly denied telling anyone, but empathized with [the victim's] feelings, especially since people were discussing the situation four years later. When asked if he had sex with any other students, [the appellant] answered in the negative. [The appellant] asked [the victim] to keep him updated on the situation.

*Id.*

We rejected the appellant's argument that law enforcement lacked reasonable grounds[4] to establish that he would discuss "suspected criminal activities." The appellant argued that, because the relationship had ended in 2006, it was unreasonable to believe that he would discuss such remote criminal conduct nearly two years later in a telephone conversation. We rejected that argument based upon

detectives' belief that the appellant would talk about the incident because of his mentor-type relationship with the victim. We found it especially important that there was no evidence suggesting that any negative feelings existed between the appellant and the victim that would prevent the appellant from talking to her. *Id.* at 525–26.

Contrary to Appellant's assertions in the instant case, we assigned no particular significance in *McMillan* to the time that had elapsed between the end of the sexual relationship and the time when the interception actually occurred. Rather, the controlling factor in *McMillan* was the nature of the connection between the appellant and the victim, which was akin to a mentor-mentee and teacher-pupil relationship. For this reason, we agree with the Commonwealth that *McMillan* controls the outcome of the instant case.

There is no doubt that Appellant and K.P. had a mentor-mentee relationship, much like the relationship we found controlling in *McMillan.* Additionally, the affidavit attached to the Commonwealth's application for a court order authorizing the interception in this case stated that Appellant was a long-time friend of K.P.'s parents. The affidavit further included a description of how the relationship between Appellant and K.P. stemmed from a mutual interest in computers, which eventually turned the relationship into a teacher-pupil type connection. Unfortunately, it was during the computer sessions that the sexual incidents occurred. Finally, as in *McMillan,* no evidence existed to sug-

---

4. In *McMillan,* we repeatedly referred to "reasonable grounds", instead of probable cause. The previous version of 18 Pa.C.S. § 5721.1, which authorizes an aggrieved party to seek suppression of improperly intercepted evidence, did not contain the term "probable cause." This section was amended in 1998, and incorporated the term "probable cause" to serve as the governing standard for

challenging an interception under the Act. Our cases arising prior to the amendment held that the standard was "reasonable grounds." *See Commonwealth v. Phillips,* 373 Pa.Super. 193, 540 A.2d 933, 937 (2008). For all practical purposes, the terms are interchangeable, as is evidenced by our decision in *McMillan,* which was published approximately 13 years after the amendments.

gest that Appellant harbored any negative feelings toward K.P. that would have caused Appellant to wish not to discuss any particular matters with K.P. While it is true that Appellant became extremely angry with K.P. between the incidents, it is clear that the anger was related to K.P.'s refusal to return to Appellant's home after the first sexual assault. Despite his trepidations, K.P. returned to the home a second time and was sexually assaulted a second time. There is no evidence of record that Appellant's anger persisted once K.P. relented to Appellant's desire for him to return, or that any other negative feelings persisted after the second assault that would lead the issuing authority to believe that Appellant would refuse to speak with K.P.

Viewing this information in a "common-sense, non-technical manner," *see Commonwealth v. Hoppert*, 39 A.3d 358, 362 (Pa.Super.2012) (quotation and citation omitted), and drawing upon our decision in *McMillan*, we find that probable cause existed to believe that communications relevant to Appellant's sexual crimes would have been obtained through the interception. *See* 18 Pa.C.S. § 5710(a)(2). We are not convinced that the time period between the crimes and the interception, even though that gap was much longer here than in *McMillan*, compels a different conclusion. Absent the close and ongoing relationship between Appellant and K.P. and K.P.'s family, the temporal aspect of Appellant's argument might be more persuasive. Nonetheless, that relationship did exist in this case and compels our probable cause determination. Accordingly, the trial court did not err in denying Appellant's suppression motion.

Appellant next contends that the trial court erred in permitting the Commonwealth to cross-examine Appellant about his post-arrest silence, in violation of his right to remain silent pursuant to Article 1, Section 9 of the Pennsylvania Constitution. At trial, during cross-examination, the following exchange occurred between the assistant district attorney and Appellant:

Q: And of course you did not mention anything to the police about this at the time they came to your house to discuss what [K.P.] was alleging, did you?

A: No, I did not.

Q: You did think that would be a good time to bring that up, that you did this because you thought he had a gun?

A: They didn't call me ahead of time to tell me they were coming, so that was a surprise as well, that the police arrived at my doorstep.

Q: Wouldn't that be the first thing that pops in your head when they bring up the conversation?

A: When they kind of slap the cuffs on—yeah. I don't think so. I thought at that point the deed is done. When they are there to arrest you, it's not time to say "Oh but there's all this other information." That's not the time.

Q: So they gave you a chance to talk about it, but it wasn't worth it at that time?

[Defense Counsel]: Objection Judge.

The Court: Overruled.

A: My assessment on that . . . is that they made it clear you know, why they were there and I connected the dots at that point. Okay, he was wired, they had a complaint, they're going to arrest me. This is not the time to talk to police officers. That is the time to, as the law permits, to

talk to your attorney and find out what is going on.

N.T., 6/2/2011, at 177–78.

Both the United States Constitution and the Pennsylvania Constitution protect a person from being compelled to be a witness against himself. *Commonwealth v. Molina*, 33 A.3d 51, 57 (Pa.Super.2011); U.S. Const. Amend. V; Pa. Const. Art. I, § 9. Our cases have established and analyzed four distinct time periods during which a defendant may remain silent or offer a statement during the criminal process: "(1) before arrest; (2) after arrest but before the warnings required by *Miranda* [5] have been given; (3) after *Miranda* warnings have been given; and (4) at trial." *Molina*, 33 A.3d at 57. From the trial exchange quoted above, it is not clear whether the prosecutor was referring to Appellant's pre-arrest silence or his post-arrest, pre-*Miranda* silence. The references in the exchange address both the time when the police initially arrived at Appellant's house and the time after handcuffs were placed on Appellant's wrists. Thus, the exchange appears to implicate both the pre-arrest and post-arrest silence. Of the four scenarios *Molina* identified above, the first and second seem most applicable to this case.

In *Molina*, we observed that the law governing a prosecutor's comments at trial concerning a defendant's post-arrest, pre-*Miranda* silence is "less clear" than the law applicable to post-*Miranda* silence. *Id.* at 58. Accordingly, we begin our analysis there.

The Fifth Amendment and the Fourteenth Amendment's due process clause generally prohibit a prosecutor from commenting upon a criminal defendant's decision not to testify or upon his decision to remain silent during the preliminary stages of a criminal investigation. *See Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Griffin v. California*, 380 U.S. 609, 613–14, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); *Commonwealth v. Randall*, 758 A.2d 669, 681 (Pa.Super.2000). The United States Supreme Court has held that, when a defendant elects to testify, neither the Fifth Amendment nor due process principles are offended by a prosecutor's reference to that defendant's silence, when that reference is used to impeach the testifying defendant's credibility. This holds true whether a defendant chooses to remain silent pre-arrest or, as is the case here, post-arrest where no *Miranda* warnings are given.[6] *See Jenkins v. Anderson*, 447 U.S. 231, 238, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (pre-arrest); *Brecht v. Abrahamson*, 507 U.S. 619, 628, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (citing *Fletcher v. Weir*, 455 U.S. 603, 606–07, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (*per curiam*) (post-arrest)).

Therefore, under a Fifth and Fourteenth Amendment analysis, the prosecutor's cross-examination in the case **sub judice** was constitutionally permissible. By testifying at trial, Appellant placed his

---

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**6.** The absence of *Miranda* warnings is significant. The warnings provide a defendant with implicit assurance that there will be no penalty for remaining silent. Therefore, as a general rule, any reference to a defendant's post-arrest and post-*Miranda* silence, even for impeachment purposes, violates due process.

*Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In the case *sub judice*, the record reveals that no *Miranda* warnings were administered to Appellant. As such, this case is properly reviewed as one where a defendant testifies and is impeached by his post-arrest, but non-*Mirandized*, silence.

credibility at issue. Appellant testified that the reason he did not deny the allegations lodged by K.P. during the interception was Appellant's belief that K.P. had a weapon, a belief that caused Appellant to fear for his own safety. The Commonwealth sought to undermine the truthfulness of this assertion by questioning Appellant as to why he did not report this information to the police at the time of arrest. Per *Brecht* and *Fletcher*, this was fair impeachment, invited when Appellant decided to take the stand. As the Supreme Court stated in *Jenkins*, "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial." 447 U.S. at 238, 100 S.Ct. 2124.

■ While Pennsylvania courts generally have held that Article 1, Section 9 of the Pennsylvania Constitution provides the same protection as the Fifth Amendment to the United States Constitution, *see Molina*, 33 A.3d at 57 (citing *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 166–67 (1999) and *Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957, 962–65 (1995)), our courts have adopted a more restrictive position on a prosecutor's ability to comment on a defendant's post-arrest silence than the United States Supreme Court did in *Brecht* and *Fletcher*. The Pennsylvania Supreme Court's seminal case in this area is *Commonwealth v. Turner*, 499 Pa. 579, 454 A.2d 537 (1982). There, the Court explicitly held that a defendant cannot be impeached by the inconsistency between his silence at the time of arrest, but before *Miranda* warnings were administered, and his trial testimony. *Id.* at 539–40.

In *Turner*, the defendant was charged with voluntary manslaughter for a shooting that occurred at a bar in Philadelphia. The defendant testified in his own defense and, for the first time, claimed that the shooting was in self-defense. During cross-examination, the prosecutor questioned the defendant as to why he had never made this claim to the police. *Id.* at 538. The defense immediately objected and requested a mistrial. The trial court denied the mistrial request, but gave the jury a cautionary instruction. The Supreme Court ultimately reversed the trial court.

The Court held that the prosecution could not impeach a testifying criminal defendant with his post-arrest silence because, *inter alia*, an accused has a legitimate expectation that no penalty will attach to a lawful exercise of his constitutional right to remain silent, whether *Miranda* warnings are given or not. The Court explained its reasoning as follows:

> The view of this Court that there exists a strong disposition on the part of lay jurors to view the exercise of the Fifth Amendment privilege as an admission of guilt is well established.... In *Commonwealth v. Haideman*, [449 Pa. 367, 296 A.2d 765 (1972) ], we stated:
>
>> "We would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt." *Walker v. United States* [404 F.2d 900 (5th Cir.1968) ], ... It is clear that "[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." *Slochower v. Board of Higher Ed. Of N.Y.* [350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) ].
>
> [*Haideman*, 296 A.2d at 767] (citations omitted).

The prejudice to the defendant resulting from reference to his silence is substan-

tial. While it is efficacious for the Commonwealth to attempt to uncover a fabricated version of events, in light of the "insolubly ambiguous" nature of silence on the part of the accused [*Doyle,* 426 U.S. at 617, 96 S.Ct. 2240], we do not think it sufficiently probative of an inconsistency with his in-court testimony to warrant allowance of any reference at trial to the silence. Accordingly, the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent. Absent such an assertion, the reference by the prosecutor to previous silence is inadmissible and reversible error.

Article 1, § 9 of the Pennsylvania Constitution provides that the accused "cannot be compelled to give evidence against himself ...," a right which is parallel to the federal constitutional right under the Fifth Amendment. We do not think that the accused should be protected only where there is governmental inducement of the exercise of the right. We acknowledge that this position is more restrictive than that taken by the United States Supreme Court in [*Fletcher* ]. However, we decline to hold, under the Pennsylvania Constitution, that the existence of *Miranda* warnings, or their absence, affects a person's legitimate expectation not to be penalized for exercising the right to remain silent. In *Commonwealth v. Easley,* [483 Pa. 337, 396 A.2d 1198 (1979) ], this Court in a footnote stated:

[W]e do not believe any reason exists to differentiate between situations where the right to remain silent is exercised following warnings and where it is exercised following warnings and where it is exercised without warnings being given. Whether or not the exercise of the right to remain silent is induced by being advised of it at the time of arrest or is self-motivated by the prior knowledge of it by the accused should not limit or extend the effect of exercising the right.

*Id.* at 1200–01, n. 5.

*Turner,* 454 A.2d at 539–40.

The Court applied its *Turner* decision to a similar situation in *Commonwealth v. Clark,* 533 Pa. 579, 626 A.2d 154 (1993). In *Clark,* while testifying, the defendant was asked by the prosecutor if he "ever" thought of telling his version of events to the police. *Id.* at 156. Applying *Turner,* the Court held that the defendant's attorney was ineffective for failing to object to the question, even though the prosecutor purported to withdraw the question. In finding that the defective stewardship caused discernible prejudice, the *Clark* Court concluded that, per *Turner,* "an impermissible reference to the accused's post-arrest silence is innately prejudicial." *Clark,* 626 A.2d at 158. Thus, in *Clark,* the Court held that the reference was not a harmless error.

*Turner* 's reach was limited in *Commonwealth v. Bolus,* 545 Pa. 103, 680 A.2d 839 (1996). In that case, the Court was "called upon for the first time to decide whether a prosecutor may refer to a criminal defendant's pre-arrest silence." *Id.* at 843. The Court expressly distinguished *Turner* based upon the time at which the accused's silence occurred. The Court explained:

We find *Turner,* however, to be distinguishable from the instant matter. In *Turner,* the period of silence which was

referenced by the prosecution occurred after the defendant's arrest, but prior to the time the defendant was given his *Miranda* warnings. In the instant matter, the prosecutor questioned Appellant regarding his silence which occurred months before he was arrested.

*Id.* The *Bolus* Court adopted the United States Supreme Court's rationale in *Jenkins*, and held that, "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit a prosecutor from impeaching a defendant's credibility by referring to his pre-arrest silence." *Id.* at 844.

The Court again confronted *Turner* in *Commonwealth v. Mitchell*, 576 Pa. 258, 839 A.2d 202 (2003). In *Mitchell*, the Court noted its faithfulness to *Turner*'s dictates, *Id.* at 213 (citing *Commonwealth v. Costa*, 560 Pa. 95, 742 A.2d 1076 (1999); *Commonwealth v. DiPietro*, 538 Pa. 382, 648 A.2d 777 (1994); and *Clark* ), but nonetheless observed that not all references to post-arrest silence required automatic relief under *Turner*. To be entitled to relief under *Turner*, first, "it must be clear that the testimonial reference is to post-arrest silence." *Mitchell*, 839 A.2d at 213. Otherwise, the alleged improper comments would be controlled by *Bolus*. Second, if a *Turner* type error is found, the error must not be harmless. *Mitchell*, 839 A.2d at 214. If either of these two elements is not satisfied, *Turner* will not provide relief.

As noted, in *Clark*, the Pennsylvania Supreme Court held that, by its very nature, "an impermissible reference to the accused's post-arrest silence is innately prejudicial." *Clark*, 626 A.2d at 158. However, in *Commonwealth v. DiNicola*, 581 Pa. 550, 866 A.2d 329 (2005), the Court held the exact opposite, albeit in a pre-arrest silence case, emphasizing that "the mere revelation of silence does not estab-

lish innate prejudice." *Id.* at 336–37 (citing *Commonwealth v. Whitney*, 550 Pa. 618, 708 A.2d 471, 478 (1998) ("Even an explicit reference to silence is not reversible error where it occurs in a context not likely to suggest to the jury that silence is the equivalent of a tacit admission of guilt")). *Clark* notwithstanding, every violation of *Turner* must, as the Court pointed out in *Mitchell*, still withstand a harmless error challenge. The *Mitchell* Court explained the standard for determining harmless error in this context:

> An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable probability that the error may have contributed to the verdict, it is not harmless. In reaching that conclusion, the reviewing court will find an error harmless where the uncontradicted evidence of guilt is so overwhelming, so that by comparison the error is insignificant.

*Mitchell*, 839 A.2d at 214–15.

██ In the instant case, to the extent that the prosecutor's cross-examination referred to Appellant's post-arrest silence, we hold that the questions violated *Turner*. Nonetheless, we also find the error to be harmless. The victim testified in detail as to the two instances of sexual abuse, which the jury unquestionably credited. Moreover, the jury heard the intercepted conversation between Appellant and K.P. During that lengthy conversation, Appellant never denied sexually assaulting K.P. To the contrary, Appellant expressed mortification and shame. During the conversation, Appellant was remorseful, and begged for K.P.'s forgiveness. Considering this evidence, particularly the intercepted conversation, and "comparing it in weight to the impact that the error caused" (*i.e.*, through the prosecutor's line

of questioning), we conclude that the error was insignificant, and, therefore, harmless. *Mitchell,* 839 A.2d at 215.

■ To the extent that the prosecutor's questions were directed at Appellant's pre-arrest silence, *Bolus* dictates that no error occurred. The significant fact here is that, having stood on his right to remain silent at all times prior to trial, Appellant nonetheless chose to testify at trial. When a defendant elects to testify, neither the right to remain silent nor due process principles are offended by a prosecutor's reference to that defendant's pre-arrest silence, when that reference is used to impeach the testifying defendant's credibility. *Bolus, Jenkins, supra.* This is precisely what occurred here. Appellant testified that he believed K.P. had a weapon at the time of the intercepted conversation, which caused Appellant not only to be in fear for his safety but also caused him to make the statements that he made, instead of denying the allegations. The Commonwealth attempted to impeach the credibility of this assertion by inquiring about Appellant's silence at the time the police arrived. Per *Bolus* and *Jenkins,* this was fair impeachment. Accordingly, Appellant's constitutional rights were not violated by the prosecutor's reference to Appellant's pre-arrest silence, and no relief is due.

■ Appellant's final four issues relate to the admissibility of evidence. "The admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." *Commonwealth v. Glass,* 50 A.3d 720, 724–25 (Pa.Super.2012) (citation and internal quotation marks omitted). Where an error is deemed to be harmless, a reversal is not warranted. Regarding the erroneous admission of evidence, harmless error exists where:

(1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hutchinson,* 571 Pa. 45, 811 A.2d 556, 561 (2002) (quoting *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344, 350 (1999)).

■ Appellant first claims that the trial court erred in permitting the Commonwealth to call Kim Disciullo, a social worker for Bucks County Children and Youth Services, as a rebuttal witness at trial. During his testimony, Appellant admitted on cross-examination that he believed that the charges lodged against him were part of a conspiracy orchestrated by the detectives and the assistant district attorney prosecuting the case. N.T., 6/2/2011, at 160–62. Appellant testified that he did not know whether the District Attorney was part of the alleged conspiracy. N.T., 6/2/2011, at 166. Appellant denied that he ever included the Attorney General in the list of the suspected co-conspirators. N.T., 6/2/2011, at 167.

On rebuttal, the Commonwealth called Ms. Disciullo to rebut Appellant's disavowal of any belief that the Attorney General and others were members of this alleged conspiracy aiming wrongfully to prosecute Appellant. Ms. Disciullo testified that she was a social worker with Bucks County Children and Youth. She became involved with Appellant's family, particularly with Appellant's minor son, after the charges were filed against Appellant. Ms. Disciul-

lo testified that, during one conversation with Appellant and his wife, Appellant told her that his criminal case was part of a conspiracy, though he was unsure as to why he was the target of that conspiracy. Ms. Disciullo further testified to Appellant's statement (during that conversation) that, "in the end," he would ensure that the District Attorney and the Attorney General would "go down for this." N.T., 6/2/2011, at 242.

Appellant now claims that Ms. Disciullo's testimony was improper rebuttal, because her testimony amounted to nothing more than an attempt to contradict collateral issues raised during trial.[7] Appellant maintains that the conspiracy claim was irrelevant and immaterial to the ultimate issue in the case: to wit, whether Appellant sexually assaulted K.P. Brief for Appellant at 26. We disagree.

A party may produce evidence to rebut testimony that he or she has elicited from an opponent's witness on cross-examination. *Commonwealth v. Smith*, 548 Pa. 65, 694 A.2d 1086, 1092 (1997). However, Appellant is correct that rebuttal evidence is limited to matters that are material to the issues presented in the case. Indeed, extrinsic evidence is inadmissible if offered only to rebut a collateral matter. *See Commonwealth v. Wright*, 308 Pa.Super. 263, 454 A.2d 122, 124 (1982).

Appellant took the stand in his own defense and denied that he sexually abused K.P. On cross-examination, the Commonwealth attempted to impeach Appellant's testimony by exploring the various reasons that Appellant had offered to explain his belief that the charges against him were fabricated. One such reason was the al-

leged conspiracy that existed against him. Indeed, that the charges against him were fabricated was the heart of Appellant's defense. Ms. Disciullo's testimony clarifying the extent to which Appellant believed in the existence of that conspiracy was a matter which touched directly on that defense. Appellant essentially denied telling Ms. Disciullo that the District Attorney and the Attorney General were part of this conspiracy. Ms. Disciullo was called to rebut that denial. Clearly, the Commonwealth attempted to discredit that defense by demonstrating not only the unlikelihood that such a conspiracy, as believed by Appellant, existed, but also the dubiousness of his alleged claim that the conspiracy reached as far as he had claimed. This was particularly so given that Appellant could not offer any possible motive for the alleged conspiracy to target him. Because the rebuttal testimony responded directly to the defense offered by Appellant, that testimony was not offered strictly to rebut a collateral matter. Therefore, the trial court did not abuse its discretion in admitting Ms. Disciullo's testimony.

Appellant's next two arguments are presented together in his brief. *See* Brief for Appellant at 29. In both arguments, Appellant alleges that the trial court improperly admitted hearsay statements.

The first challenged testimony occurred when V.P., K.P.'s mother, testified at trial that Appellant's wife, Karen Kuder, told V.P. that Appellant was very upset when K.P. refused initially to go back to Appellant's home to help him with the computers (*i.e.*, after the first sexual assault had occurred). Ms. Kuder told V.P. that Appellant was so angry with K.P. that Appel-

---

**7.** Appellant also claims that the trial court erred in permitting Appellant to be cross-examined on the conspiracy issue, which he deems to be a collateral matter. However, Appellant offers no citation to any authority in support of this particular challenge to the propriety of the cross-examination. Therefore, that specific argument is waived. *See* Pa.R.A.P. 2119; *Commonwealth v. Hunzer*, 868 A.2d 498, 509 (Pa.Super.2005).

lant was talking about selling their house. N.T., 6/1/2011, at 135–36. Appellant claims that this testimony constituted inadmissible double hearsay; the first hearsay statement was Appellant's to Ms. Kuder, and the second was from Ms. Kuder to V.P.

The second challenged statement was presented by Detective Thomas Thiel, who testified that V.P. told him that on one occasion she witnessed Appellant yell at K.P. for no apparent reason. N.T., 6/2/2011, at 22.

 Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. *Commonwealth v. Puksar,* 559 Pa. 358, 740 A.2d 219, 225 (1999). As a general rule, hearsay is inadmissible, because such evidence lacks guarantees of trustworthiness fundamental to our system of jurisprudence. *Commonwealth v. Dargan,* 897 A.2d 496, 500 (Pa.Super.2006) (citations omitted). The rule against admitting hearsay evidence stems from its presumed unreliability, because the declarant cannot be challenged regarding the accuracy of the statement. *Commonwealth v. Rush,* 529 Pa. 498, 605 A.2d 792, 795 (1992). However, certain exceptions "have been fashioned to accommodate certain classes of hearsay that are substantially more trustworthy than hearsay in general, and thus merit exception to the hearsay rule." *Commonwealth v. Charlton,* 902 A.2d 554, 559 (Pa.Super.2006) (citing *Commonwealth v. Bean,* 450 Pa.Super. 574, 677 A.2d 842, 844 (1996)).

 We begin with V.P.'s testimony, which contained the alleged hearsay statement uttered by Ms. Kuder. Appellant argues that the trial court improperly overruled his objection to this testimony, and that the hearsay statements do not fall within either the present sense impression or the then existing mental, emotional, or physical condition exceptions to the hearsay rule, *see* Pa.R.E. 803(1); 803(3), which exceptions the trial court found would apply if the statements were hearsay.

Appellant assumes that the statement made by Ms. Kuder to V.P. to the effect that Appellant was very upset with K.P. for not coming back to the house was hearsay. That is, Appellant maintains that the statement was offered for the truth of the matter asserted. After Appellant lodged the objection, the trial court immediately overruled it without providing the Commonwealth an opportunity to respond or make an offer of proof. N.T., 6/1/2011, at 135–36. Thus, the Commonwealth was never able to explain to the trial court its purpose in offering the statement. On appeal, the Commonwealth now argues that the statement by Ms. Kuder was offered not to show that Appellant was angry in fact, *i.e.,* the truth of the matter asserted, but rather "to show that K.P. believed [Appellant] was angry and the effect that belief had on K.P.'s future conduct." Brief for the Commonwealth at 27. "When an extrajudicial statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule." *Puksar,* 740 A.2d at 225 (citing *Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865, 870 (1986)).

At its core, the Commonwealth's argument is that Ms. Kuder's statement to V.P. was offered to show the effect that the statement had on K.P.'s actions. Essential to the logic of this argument is the assumption that, at some point, V.P. had to tell K.P. about the statement. Otherwise, the statement could not have had any impact upon K.P.'s actions. The record is devoid of any evidence to substantiate this link in the Commonwealth's argument. The Commonwealth recognizes this dearth, but, in order to keep its argument

alive, urges this Court effectively to take a leap of faith and find that it was "reasonable for the jury to infer [that K.P.'s] mother would have spoken to him after the call." Brief for the Commonwealth at 27. There simply is no support in the record or in the law permitting us to validate the Commonwealth's argument.

The Commonwealth also argues that the statement by Ms. Kuder was non-hearsay because it corroborated K.P.'s testimony relevant to Appellant's level of anger when K.P. refused to return to Appellant's home after the first sexual assault. Brief for Commonwealth at 28. Of course, for evidence to corroborate another fact, that evidence must be true. Otherwise, it would have no corroborative effect. The Commonwealth's own argument demonstrates its true purpose in offering the statement: to prove the truth of the matter asserted. We agree with Appellant that the statement was offered for the truth of the matter asserted, and was inadmissible hearsay.

The same can be said for V.P.'s statement to Detective Thiel that, on one occasion, Appellant yelled at K.P. for no reason. This was also hearsay, with no applicable exceptions permitting admissibility. In response to this objection, the trial court gave the jury a cautionary instruction which characterized the statement as hearsay, but directed the jury to consider only that the statement was made, not the veracity of the statement. N.T., 6/2/2011, at 23. Appellant argues that the mere fact that the statement

was made was irrelevant to any issue in the case. According to Appellant, the erroneous admission of this statement, when combined with the testimony given by V.P. and objected to on hearsay grounds, prejudiced Appellant to the degree that a new trial is warranted.

The Commonwealth's basis for offering V.P.'s statement through Detective Thiel again is unclear from the record. The Commonwealth now contends that the statement was offered as a prior consistent statement in response to defense counsel's cross-examination challenge to the veracity of V.P.'s testimony that she learned of Appellant's anger from Ms. Kuder and that the relationship changed thereafter. However, our review of the trial transcript yields no indication that the statement was so offered. Moreover, for such testimony properly to be admitted as a prior consistent statement, a defendant must be permitted to have the opportunity to cross-examine the declarant about the statement. *See* Pa.R.E. 613(c).[8] The contested statement was introduced after V.P. testified, and after she was cross-examined by defense counsel. Nothing in the record indicates that defense counsel was afforded an opportunity to cross-examine V.P. about this particular statement after it was introduced during Detective Thiel's testimony. Therefore, Pa.R.E. 613(c) does not avail the Commonwealth here.

Like the statement offered during V.P.'s testimony, the statement offered during Detective Thiel's testimony cannot be salvaged and rendered admissible on some

---

8. Pa.R.E. 613(c) states:

(c) **Evidence of prior consistent statement of witness.** Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of:

(1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or (2) having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

non-hearsay basis. V.P.'s statement reported by Detective Thiel appears to have been offered for its truth, so as to corroborate earlier testimony by V.P. and K.P.

▮ Nonetheless, even though both contested statements were hearsay, Appellant is not entitled to relief in the form of reversal and a new trial. The trial court's erroneous admission of these statements was harmless. Appellant's convictions were amply supported by K.P.'s unequivocal testimony detailing the two incidents of sexual abuse at the hands of Appellant, which the jury plainly credited. Furthermore, K.P.'s testimony was bolstered by the recording of the intercepted conversation between K.P. and Appellant, during which Appellant made no attempt to deny the allegations, and instead expressed remorse and shame. Finally, evidence that Appellant angrily reacted to K.P.'s refusal to return to his home already had been admitted without objection. N.T., 6/1/2011, at 50. Thus, any additional evidence relevant to Appellant's hostile mindset at this particular time was plainly cumulative and could have had no discernible impact on the ultimate outcome of this case.

▮ Appellant's final challenge asserts that the trial court erred in permitting the Commonwealth to cross-examine defense character witnesses regarding their personal opinions about Appellant. Moreover, Appellant claims that the trial court further erred by permitting the Commonwealth to put hypothetical questions to these witnesses. Specifically, Appellant directs this Court's attention to the following two exchanges between the Commonwealth and character witnesses David Black and Allen Lockard, both of whom testified that Appellant had a reputation in the community for being law-abiding:

**Cross-examination of David Black:**

Q: If you were to learn hypothetically that [Appellant], somewhere along the way, had admitted that he had good memories of masturbating a young child would that change your opinion of what you would allow your children to do around [Appellant]?

[Defense Counsel]: Objection to the form of the question. Facts not in evidence.

The Court: Overruled, based on the discussion held at side bar.

A: Yes, it would.

N.T., 6/2/2011, at 207–08.

**Cross-examination of Allen Lockard:**

Q: Sir what can you think of that would change that reputation, if anything?

[Defense Counsel]: Objection, calls for his own opinion.

The Court: Overruled.

Q: Is there anything you can think of that would change that reputation?

A: Sure, any form of slander could change anybody's reputation.

Q: What if you heard [Appellant] make certain admissions to certain misconducts of a sexual nature? Would that change his reputation in your opinion?

[Defense Counsel]: Objection. Asking for a conclusion and his own opinion.

The Court: Overruled.

A: It could.

N.T., 6/2/2011, at 212.

▮ In a criminal case, the defendant may offer character witnesses to testify as to that defendant's reputation in the community regarding a relevant character trait. *See* Pa.R.E. 404(a)(1); 405(a). Of course, the Commonwealth may attempt to impeach those witnesses. *Commonwealth*

*v. Hoover,* 16 A.3d 1148, 1149 (Pa.Super.2011) (citing *Commonwealth v. Morgan,* 559 Pa. 248, 739 A.2d 1033, 1035 (1999)). "For example, when cross-examining character witnesses offered by the accused, the Commonwealth may test the witnesses' knowledge about specific instances of conduct of the accused where those instances are probative of the traits in question." *Hoover,* 16 A.3d at 1149–50 (citing Pa.R.E. 405(a)). However, the Commonwealth's right to cross-examine character witnesses is not unlimited: the Commonwealth may not cross-examine a character witness about a defendant's uncharged criminal allegations, *Morgan,* 739 A.2d at 1035–36, or a defendant's arrests that did not lead to convictions. *Commonwealth v. Scott,* 496 Pa. 188, 436 A.2d 607, 611–12 (1981).

In this case, the Commonwealth attempted to cross-examine these two witnesses about allegations for which Appellant was not yet convicted. While this may appear to run afoul of the above proscriptions, we cannot ignore the fact that the Commonwealth was merely responding to what Appellant raised on direct examination. In other words, Appellant opened the door on direct examination to these inquiries on cross-examination. On direct examination, Mr. Black testified as follows:

> I talk to [Appellant] all the time, walking up and down the street with my kids. My youngest daughter was over playing with his son.... I know when their son was born, my daughter is 11 now, but she would play with [Appellant's] son at their house. And sometimes [Appellant's] son would play at our house. If I thought anyone wasn't law abiding or I didn't trust, I would not put my child in that position.

N.T., 6/2/2011, 199–200.

Mr. Lockard testified to his belief that "[Appellant] is very much of an upstanding person and above reproach." N.T., 6/2/2011, at 211–12. Thus, on direct examination, Appellant elicited testimony from both of these witnesses regarding their personal opinions of Appellant, which is improper character testimony under Pa. R.E. 405(a). Appellant opened the proverbial door and "cannot complain that the Commonwealth chose to explore further what was behind that door." *Commonwealth v. Smith,* 609 Pa. 605, 17 A.3d 873, 914 (2011). The Commonwealth's cross-examination was directed toward what might change these personal opinions. This was a fair response to Appellant's direct examination. The trial court did not abuse its discretion in permitting these lines of cross-examination.

Moreover, even if the interrogation went beyond the permissible scope of cross-examination, such an error undoubtedly would be harmless. Mr. Black and Mr. Lockard were two of twenty-two character witnesses called on Appellant's behalf. The jury was able to consider twenty other character witnesses, all of whom testified that Appellant had a reputation for being law-abiding. Thus, any imperfection in the cross-examination of two of these witnesses did not deny the jury the ability to consider evidence of Appellant's good character. Moreover, our detailed review of the trial record indicates that the evidence of Appellant's guilt submitted to the jury was overwhelming, and any erroneous ruling with regard to the cross-examinations of Mr. Black and Mr. Lockard was *de minimis* and did not prejudice Appellant. *See Hutchinson, supra.*

Judgment of sentence affirmed. Jurisdiction relinquished.