J-S01005-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| HENRY DION WILLIAMS, | : | |
| | : | |
| Appellant | : | No. 2014 WDA 2013 |

Appeal from the Judgment of Sentence entered on November 26, 2013
in the Court of Common Pleas of Washington County,
Criminal Division, No. CP-63-CR-0001527-2012

BEFORE: GANTMAN, P.J., JENKINS and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:          **FILED FEBRUARY 26, 2015**

Henry Dion Williams ("Williams") appeals from the judgment of sentence entered following his conviction of first-degree murder, persons not to possess firearms and firearms not to be carried without a license.[1]  We affirm.

In its Opinion, the trial court set forth the relevant facts underlying the instant appeal, which we adopt and incorporate herein by reference.  **See** Trial Court Opinion, 7/3/14, at 4-9.

Following a jury trial, Williams was convicted of the above-described charges.  Thereafter, for his conviction of first-degree murder, the trial court sentenced Williams to life in prison, ordered that Williams pay restitution to the victim's mother in the amount of $6,685, and required Williams to pay

---

[1] 18 Pa.C.S.A. §§ 2502(a), 6105, 6106.

the costs of prosecution. For his conviction of persons not to possession firearms, the trial court imposed a concurrent prison term of three to six years. Williams's conviction of carrying a firearm without a license merged with his other firearms conviction at sentencing. Williams timely filed a Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

On appeal, Williams raises the following claims for our review:

I.   Did the trial court err in denying [Williams's] Motion to Dismiss under Pa.R.C[rim.]P., Rule 600?

II.  Did the trial court err by allowing a Commonwealth witness, [Sergeant] Ronald Aiello ["Sergeant Aiello"], to present testimony of a prior consistent statement provided to him by another Commonwealth witness, Kayla Cunningham ["Cunningham"], after that witness had concluded her testimony?

III. Did the trial court err by allowing a Commonwealth witness, Lt. Daniel Stanek ["Lieutenant Stanek"], to present hearsay testimony regarding information provided to him by [Williams's] mother, Valerie Clark ["Clark"], when that witness did not testify and such testimony by [Lieutenant] Stanek was beyond the scope of cross[-]examination?

IV.  Did the trial court err by allowing a Commonwealth witness, [Lieutenant] Stanek, to present testimony[,] which was speculative in nature[,] regarding the truthfulness and accuracy of the testimony of the Commonwealth's witnesses, [] Cunningham and April Lash ["April"]?

V.   Did the trial court err by allowing a Commonwealth witness, [Lieutenant] Stanek, to present testimony regarding gunshot residue evidence when said witness was not qualified as an expert in the field of gunshot residue evidence?

VI. Did the trial court err by denying [Williams's] Motion to exclude[,] for any purposes[,] the statements of an eye witness, Desiree Wilson ["Wilson"], which statements were not provided to [Williams] in response to his request for discovery materials until the date before the witness was scheduled to testify?

VII. Did the trial court err and deny [Williams] a fair trial and due process by granting to the Commonwealth the right to use in rebut[t]al, if it chose to so use, the statements of an eye witness, [] Wilson, when those statements were not provided to [Williams] in response to his request for discovery materials[,] and which statements effected [Williams's] decision whether or not to testify at trial?

VIII. Did the Commonwealth present sufficient evidence to sustain the verdict of guilty for each count, including: criminal homicide[-]murder of the first degree, possession of a firearm prohibited, and firearms not to be carried without a license?

IX. Was the verdict of guilty entered against the weight of the evidence on each count, including: criminal homicide[-]murder of the first degree, possession of a firearm prohibited, and firearms not to be carried without a license?

Brief for Appellant at 4-5.

Williams first claims that the trial court improperly denied his Motion to Dismiss pursuant to Pennsylvania Rule of Criminal Procedure 600. *Id.* at 11. Williams points out that Lieutenant Stanek filed the Criminal Complaint on May 24, 2012, but Williams was not arrested and incarcerated until June 20, 2012. *Id.* Williams asserts that the Commonwealth did not bring him to trial until September 9, 2013, "which is more than 365 days from the date of the filing of the [C]riminal [C]omplaint." *Id.* According to Williams, at no

time did he request a continuance nor was he unavailable to proceed to trial. *Id.* at 12. Williams further argues that the pre-arrest delay of 27 days caused him substantial prejudice, "as he had not been to trial within the time limits of Rule 600." *Id.* at 13. Williams contends that the pre-arrest delay of 27 days is not excludable from the Rule 600 calculation, and that the Commonwealth did not exercise due diligence during this delay. *Id.*

We first set forth our standard and scope of review:

In evaluating Rule [600] issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule [600]. Rule [600] serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule [600] was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the

- 4 -

Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule [600] must be construed in a manner consistent with society's right to punish and deter crime. In considering [these] matters . . . courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Horne*, 89 A.3d 277, 283-84 (Pa. Super. 2014) (quoting *Commonwealth v. Ramos*, 936 A.2d 1097, 1100 (Pa. Super. 2007) (*en banc*)).

In its Opinion, the trial court addressed Williams's claim and concluded that it lacks merit. *See* Trial Court Opinion, 7/3/14, at 9-16. The trial court's findings are supported in the record and its legal conclusions are sound. *See id.* Discerning no abuse of discretion by the trial court in rejecting Williams's claim as without merit, we affirm on the basis of the trial court's Opinion with regard to Williams's Rule 600 claim. *See id.*

In his second issue, Williams argues that the trial court improperly admitted the testimony of Sergeant Aiello, regarding the prior consistent statements made by Cunningham. Brief for Appellant at 15. Williams asserts that Sergeant Aiello's testimony about statements made by Cunningham "is hearsay and served to improperly bolster [Cunningham's] testimony." *Id.* at 16.

"An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay …, is abuse of discretion." *Commonwealth v. Walter*, 93 A.3d 442, 449 (Pa. 2014).

"Hearsay means a statement that ... the declarant does not make while testifying at the current trial or hearing; and ... a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). "Hearsay is not admissible except as provided by [the Pennsylvania Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

Pennsylvania Rule of Evidence 613(c) addresses the admissibility of a prior consistent statement by a witness as follows:

> Evidence of a prior consistent statement by a witness is admissible for rehabilitation purposes if the opposing party is given an opportunity to cross-examine the witness about the statement, and the statement is offered to rebut an express or implied charge of:
>
> (1)  fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose; or
>
> (2)  having made a prior inconsistent statement, which the witness has denied or explained, and the consistent statement supports the witness' denial or explanation.

Pa.R.E. 613(c).

In its Opinion, the trial court addressed Williams's claim and concluded that it lacks merit. *See* Trial Court Opinion, 7/3/14, at 16-18. Upon review, we discern no abuse of discretion or error by the trial court. Accordingly, we adopt the trial court's analysis, and affirm based upon the rationale set forth in the trial court's Opinion with regard to this claim. *See id.* We additionally note the following.

Even if the trial court improperly had admitted Sergeant Aiello's testimony, we conclude that such error would be harmless. "Where an error is deemed to be harmless, a reversal is not warranted." ***Commonwealth v. Kuder***, 62 A.3d 1038, 1053 (Pa. Super. 2013). Harmless error exists where

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Id.*** (citation omitted).

Our review discloses that Sergeant Aiello's testimony regarding his interview of Cunningham is merely cumulative, and caused Williams no prejudice. During cross-examination, defense counsel questioned Cunningham regarding whether she saw anyone in the parking lot upon exiting Pickle's Bar:

> Q. [Defense counsel]: As you and [April] were going out of the bar at Pickle's to get in your car to go to [Taco] Bell, did you stop and talk to anybody?
>
> A. [Cunningham]: No. Well, my uncle, on our way out of the bar, he spoke to us and then he came out and said something to us and he went back in. But other than that, no.
>
> Q. You guys turned around to answer him and then continued at that point in time?
>
> A. Yes.
>
> Q. I believe you said you didn't see anybody else outside at that point in time?

- 7 -

A. No.

Q. You proceed across the street, you said you walked in front of your vehicle, between your vehicle and another vehicle?

A. Yes.

…

Q. Was there any reason why you chose to drive your vehicle instead of April driving hers?

A. No.

Q. You did not open April's door first?

A. No.

Q. You went around and started to open yours?

A. I didn't even get to open mine, no.

Q. Did you get to your side of the car?

A. I did, but I didn't get to open my door.

Q. Because you heard a noise?

A. Yes.

Q. Which I believe you characterized as a shot?

A. Yes.

Q. Prior to hearing the shot[,] you were not looking down the street, correct?

A. No. I looked at them whenever I walked out of the bar, but I was looking straight ahead and then I turned and looked.

Q. When you heard this first shot you started to run at that point?

A. No. I turned and looked because I thought it was fireworks, that's what it sounded like. Then I seen sparks come out from two other[s] and I knew right then and there and I seen the guy grab his chest and he hit the ground. The shooter looked, just looked over at me because I screamed[,] and started backing up in the parking lot.

Q. The person you described as the shooter started backing up, walking backwards?

A. Yes.

Q. At that point you then run across the street, you and April run across the street and go to Pickle's to go inside?

A. Yes.

Q. As you and April are running back to Pickle's[,] did you see anyone else in your pathway?

A. No.

Q. You did not see Mark Jones at that point?

A. No.

Q. I believe it was your testimony that you did not see Mark Jones outside at all?

A. No.

Q. Prior to entering into Pickle's bar after you notice this person backing through the parking lot, did you stay outside long enough to see that person actually go all the way through the parking lot?

A. After so far back[,] he was like out of sight as we ran into the bar just to protect ourselves as well.

Q. I guess what I'm asking you is, you saw the person backing up into the parking lot to a point in time where you could not see anybody?

A. Right.

Q. One because it was dark or because you were running into Pickle's bar and not looking anymore?

A. No. Once I seen, like heard the shots and then I looked and seen like he was making contact with me as he was backing up, I ran into the bar and then that was it.

Q. So, really other than these couple of steps back up you don't know where this person you described as the shooter went after that?

A. No.

Q. So he may have continued all the way back into the alley run left down Ewing, may have run right down Ewing, is that correct?

A. Right.

Q. The person that you said was the shooter, after you ran back into Pickle's[,] did you ever see this person again that evening?

A. No.

N.T., 9/2-13/13, at 189-93. On re-direct examination, the prosecutor questioned Cunningham about her observations upon leaving the bar:

Q. [The Commonwealth]: In Commonwealth's [Exhibit] 4[, a videotape,] you and April are about to go out [of] the door. … [A]s you go out you are first and it appears you're looking back into the bar?

A. [Cunningham]: Yes.

Q. Then you turn to your right to go across the street?

A. Yes.

Q. Did you at any time look to the left to see who was to the left of the door at Pickle's?

A. No.

Q. As you went across the street[,] did you turn around to see what April was doing behind you?

A. No.

Q. You don't know if April came in contact with anybody who might have been on the left side of the door?

A. No.

*Id.* at 192-93.

At the close of redirect examination, and upon no further questions by defense counsel, the trial court questioned Cunningham as follows:

Q. [THE COURT]: … I just want to clarify. You said you saw the sparks fly out?

A. [Cunningham]: Yes.

Q. Did you see the gun?

A. I did not see the gun personally, but the way he was holding on his side[,] I could tell—

Q. You could see his arm?

A. Yes.

Q. And you saw sparks fly from there?

A. Yes.

Q. And that's the second two?

A. Right.

Q. Not the first one?

A. Yes.

*Id.* at 193-94.

The Commonwealth next called Sergeant Aiello as a witness. The Commonwealth questioned Sergeant Aiello about his interview of Cunningham at the crime scene:

Q. [The Commonwealth]: Did you [] have the opportunity to interview witnesses?

A. [Sergeant Aiello]: Ms. Cunningham.

Q. Did you take a written statement or just kind of your own interview at first?

A. Just my own interview.

Q. Was that reduced to a report?

A. Yes sir.

Q. With regard to her statement to you[,] how did she describe the shooter?

[Defense counsel]: Objection, Your Honor. Ms. Cunningham has testified. She could have given that information on direct testimony[,] as it pertains to it and now it would be hearsay.

[The Commonwealth]: We submit that inasmuch as she has testified to prior consistent statements, she has been subject [to] cross-examination.

[Defense counsel]: Your Honor, she has not seen this officer's report. She has not initialed it and indicated that it is in fact what she told the officer, so it would not be admissible at this point in time.

THE COURT: The Officer can give [Cunningham's] testimony as part of his report to the extent it's consistent or inconsistent. I'm going to overrule the objection.

Q. [The Commonwealth]: How did she describe the shooter?

A. [Sergeant Aiello]: She states that he was wearing a black shirt and flat billed cap.

- 12 -

Q. Did she give any description of the event in terms of the weapon being pointed by that shooter?

A. Yes. She said that there was a handgun and she saw sparks coming out of it.

Q. Did she say what she did after she heard these shots?

A. She stated that she heard three shots and she screamed when it happened.

Q. Did she say what she then did?

A. Yes. She said that the individual looked at her, the other male fell down close to the sidewalk and street and then she ran inside the bar, to get inside the bar.

*Id.* at 195-97.

Sergeant Aiello's testimony regarding his interview with Cunningham was cumulative, and any prejudice resulting from the admission of this evidence was, at best, *de minimus*. **See Kuder**, 62 A.3d at 1053. Under these circumstances, even if the trial court had erred in admitting Sergeant Aiello's testimony regarding Cunningham's statements, Williams is not entitled to relief. **See id.**

In his third issue, Williams claims that the trial court improperly admitted hearsay testimony by Lieutenant Stanek regarding statements made by Williams's mother, Clark. Brief for Appellant at 17. According to Williams, Lieutenant Stanek testified that he had questioned Clark regarding

a vehicle that was registered to her being found at the scene of the homicide, regarding who had use of that vehicle, regarding the fact that a warrant for the arrest of [Williams] for that homicide had been issued, and implying that she had

- 13 -

communicated this information to [Williams,] resulting in a delay in his arrest for 27 days from the date of the incident.

*Id.* Williams asserts that the trial court improperly admitted this testimony, when Clark was available to testify and was present in the courtroom during Lieutenant Stanek's testimony. *Id.* at 18. Williams further asserts that the trial court improperly admitted the redirect testimony of Lieutenant Stanek, which exceeded the scope of cross-examination. *Id.* at 17.

In its Opinion, the trial court addressed Williams' claim and concluded that it lacks merit. *See* Trial Court Opinion, 7/3/14, at 18-23. We agree with the sound reasoning of the trial court, as stated in its Opinion, and affirm on this basis as to Williams's third issue. *See id.*

In his fourth issue, Williams claims that the trial court improperly permitted Lieutenant Stanek "to present testimony which was speculative in nature regarding the truthfulness and accuracy" of testimony provided by Cunningham and April. Brief for Appellant at 19. Williams claims that the trial court improperly permitted Lieutenant Stanek to testify as to whether he would be surprised "that various things could not be seen in the surveillance videos." *Id.* In support, Williams offers the following argument:

> [T]he admission of such testimony was in error, and was extremely prejudicial to [Williams]. This speculative testimony by [Lieutenant] Stanek related to the actions taken or which may have been taken by the Commonwealth's "eye witnesses[,]" [] Cunningham and [April,] and as such was an attempt to bolster the truthfulness and accuracy of their testimony given prior to [Lieutenant] Stanek's testimony.

- 14 -

*Id.*

The trial court addressed this claim in its Opinion and concluded that it lacks merit. ***See*** Trial Court Opinion, 7/3/14, at 23-25. Upon our review of the record, we agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis. ***See id.***

In his fifth issue, Williams claims that the trial court improperly admitted the testimony of Lieutenant Stanek regarding gunshot residue evidence, "when said witness was not qualified as an expert in the field of gunshot residue evidence[.]" Brief for Appellant at 20. Williams challenges the admission of Lieutenant Stanek's explanation for not submitting swabs of the victim's hands, taken during the autopsy, to the Pennsylvania State Police Crime Lab for gunshot residue testing. *Id.* According to Williams, Lieutenant Stanek's testimony was "in the nature of an expert's opinion[,] as it implies that even if the swabs were sent to the Lab for gunshot residue testimony, the experts at the Lab would have found the swabs to contain nothing of evidentiary value." *Id.* at 21. Williams argues that such evidence by a lay witness is based on conjecture and speculation, and, therefore, is inadmissible. *Id.*

In its Opinion, the trial court concisely addressed this claim and concluded that it lacks merit. ***See*** Trial Court Opinion, 7/3/14, at 25-26. We agree with the sound reasoning of the trial court, as set forth in its Opinion, and affirm on this basis. ***See id.***

In his sixth and seventh issues, Williams claims that the trial court improperly admitted, as rebuttal, statements made by Wilson, where the Commonwealth had failed to provide the defense with Wilson's statements during discovery.  Brief for Appellant at 25.  Williams states that on the morning of the third day of trial, the Commonwealth advised defense counsel of its intention to call Wilson as a witness.  *Id.* at 26.  Williams claims that his counsel did not have sufficient opportunity

> to prepare for a proper cross[-]examination of the witness, particularly when it became known to the defense that the witness, [] Wilson, was claiming that another individual, Angela Butler [a.k.a.]  Angela Odum, was in the car with her and [Williams] on the night of the incident[,] after the incident occurred[,] and corroborate her testimony.

*Id.* at 26-27.  The trial court ultimately *granted* a defense Motion to preclude Wilson's testimony, permitting her testimony only on rebuttal.  *Id.* at 27.  Notwithstanding, Williams claims that the Commonwealth violated Pa.R.Crim.P. 573, and that its violation had "a chilling effect on [Williams's] decision whether or not to testify at his trial, and resulted in a violation of his constitutional right to due process and a fair trial."  *Id.*

A trial court possesses discretion in fashioning an appropriate remedy for a violation of the rules of discovery.  *Commonwealth v. Smith*, 955 A.2d 391, 394 (Pa. Super. 2008).  A trial court's ruling in this regard will not be reversed absent an abuse of discretion.  *Id.*

In its Opinion, the trial court provided a comprehensive summary of the circumstances underlying the Commonwealth's failure to provide

- 16 -

information regarding Wilson, its interpretation and application of Rule 573(B)(1)(b), and its reasons for granting Williams's Motion, but permitting the Commonwealth to present Wilson as a rebuttal witness. *See* Trial Court Opinion, 7/3/14, at 26-34. Upon our review, we find no abuse of discretion by the trial court, and affirm on the basis of its Opinion with regard to this claim. *See id.*

In his eighth issue, Williams argues that the evidence is insufficient to sustain his convictions. Brief for Appellant at 28. Williams argues that the evidence proved only that he was present at the same bar as the victim; he and the victim left the bar at about the same time; and Williams was in the general vicinity at the time of the shooting. *Id.* Williams directs our attention to evidence that he was not found in the vicinity after the shooting, and that only his mother's vehicle was found at the scene. *Id.* Williams further points out that the Commonwealth presented no scientific evidence connecting him to the firearm allegedly used in the shooting. *Id.* at 30. Finally, Williams points out discrepancies in the testimony presented by three Commonwealth witnesses. *Id.*

In reviewing a challenge to the sufficiency of the evidence, we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Bibbs*, 970 A.2d 440, 445 (Pa. Super. 2009) (citation omitted).

- 17 -

> Evidence will be deemed sufficient to support the verdict when it established each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty, and may sustain its burden by means of wholly circumstantial evidence. Significantly, [we] may not substitute [our] judgment for that of the factfinder; if the record contains support for the convictions they may not be disturbed.

*Id.* (citation and quotation marks omitted). We further are cognizant that a defendant's presence at the scene of the crime is not sufficient to establish his complicity in that crime. *Commonwealth v. Toritto*, 67 A.3d 29, 32 (Pa. Super. 2014).

The trial court addressed Williams's challenge to the sufficiency of the evidence in its Opinion, and concluded it lacks merit. *See* Trial Court Opinion, 7/3/14, at 36-38. We agree with the sound reasoning of the trial court, and affirm the trial court's rejection of this claim on the basis of the reasoning stated in its Opinion. *See id.*

Finally, Williams challenges the verdict as against the weight of the evidence. Brief for Appellant at 33. Williams claims that the Commonwealth's evidence established only that he and the victim "were both in the same bar during the same night, that they both left the bar at about the same time, and [were] in the same general vicinity when the victim sustained several gunshot wounds to his face and chest[,] which resulted in the victim's death on said date." *Id.* at 34. Williams argues that the Commonwealth presented no evidence showing Williams as possessing a firearm concealed or visibly possessed on his person. *Id.* Williams points to

discrepancies regarding what transpired prior to the shooting, and that the evidence permits more than one logical conclusion. *Id.* at 35.

In its Opinion, the trial court addressed Williams's claim and concluded that it lacks merit. *See* Trial Court Opinion, 7/3/14, at 34-36. We agree with the trial court's sound reasoning, and discern no abuse of discretion in its rejection of Williams's claim. *See id.* Accordingly, we affirm on the basis of the reasoning set forth in the trial court's Opinion with regard to this claim. *See id.*

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2015

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF )
   PENNSYLVANIA )
    )
    )
    )
vs. )   No. 1527-2012
    )
HENRY DION WILLIAMS, )
    )
   Defendant. )

## OPINION OF COURT

This matter comes before the Court upon Defendant's direct appeal from the Judgment of

Sentence dated November 26, 2013, following his conviction, after a trial by jury on September

13, 2013, of Criminal Homicide, First Degree Murder; Possession of Firearm Prohibited; and

Firearms Not to be Carried Without a License.

## Procedural History

A jury was selected on the above matter on September 9, 2013, with the Honorable John

F. DiSalle, Judge, presiding. Trial commenced on September 10, 2013, and continued through

September 13, 2013. At trial, Defendant, Henry Dion Williams, (hereinafter referred to as

"Defendant") was represented by the Office of the Public Defender of Washington County, Glen

Alterio, Esquire, and the Commonwealth was represented by Assistant District Attorney,

Michael Lucas, Esquire.

After the close of evidence and closing arguments, and following deliberations, the jury

found the Defendant guilty on September 13, 2013, of the charges of Criminal Homicide,[1] First

---

[1] 18 Pa.C.S. § 2501(a).

1

Degree Murder;[2] Possession of Firearm Prohibited;[3] and Firearms Not to be Carried Without a License.[4] The Court held a sentencing hearing on November 26, 2013.[5] Thereafter, the Court sentenced the Defendant as follows:

On the charge of Criminal Homicide, First Degree Murder, the Court sentenced the Defendant to pay the costs of prosecution, to make restitution to Shirmef Corneilus, the victim's mother, in the amount of $6,685, representing the funeral expenses, and be confined in an appropriate state correctional institution for a sentence of mandatory life imprisonment without the possibility of parole for the rest of his natural life.

On the charge of Possession of Firearm Prohibited, a Felony of the second degree, the Court sentenced the Defendant to a period of no less than three (3) years and no more than six (6) years in a state correctional facility, to run concurrently to the sentence of Murder in the First Degree.

On the charge of Firearms not to be Carried without a License, a Felony of the third degree, the Court imposed no further sentence, as that charge merged with the charge of Possession of Firearm Prohibited, for sentencing purposes.

The Defendant's total sentence is life in prison without the possibility of parole in an appropriate state correctional institution.

The Defendant filed a Notice of Appeal to the Superior Court of Pennsylvania on December 19, 2013. On December 23, 2013, the Court Ordered the Defendant to file a Concise Statement of Matters Complained of on Appeal Pa.R.A.P. 1925(b) within twenty-one (21) days.[6]

---

[2] 18 Pa.C.S. § 2502(a)
[3] 18 Pa.C.S. § 6105(a)(1)
[4] 18 Pa.C.S. § 6106 (a)(1)
[5] The Court did not order a pre-sentence investigation due to the mandatory sentence requirement.
[6] Pa.R.A.P. 1925(b)(2) states, in relevant part: *Time for filing and service.*—The judge shall allow the appellant at least 21 days from the date of the order's entry on the docket for the filing and service of the Statement.

2

The Defendant filed his Concise Statement of Issues on Appeal Pa.R.A.P. 1925(b) on January 10, 2014, within which he raised the following nine issues:

1. "Did the Trial Court err in denying the Defendant's Motion to Dismiss under Pa.R.Crim.P. 600?"

2. "Did the Trial Court err by allowing a Commonwealth witness, Sgt. Ronald Aiello, to present testimony of a prior consistent statement provided to him by another Commonwealth witness, Kayla Cunningham, after that witness had concluded her testimony?"

3. "Did the Trial Court err by allowing a Commonwealth witness, Lt. Daniel Stanek, to present hearsay testimony regarding information provided to him by Defendant's mother, Valerie Clark, when that witness did not testify and such testimony by Lt. Stanek was beyond the scope of cross examination?"

4. "Did the Trial Court err by allowing a Commonwealth witness, Lt. Daniel Stanek, to present testimony which was speculative in nature regarding the truthfulness and accuracy of the testimony of the Commonwealth's witnesses, Kayla Cunningham and April Lash?"

5. "Did the Trial Court err by allowing a Commonwealth witness, Lt. Daniel Stanek, to present testimony regarding gunshot residue evidence when said witness was not qualified as an expert in the field of gunshot residue evidence?"

6. "Did the Trial Court err by denying the Defendant's Motion to Exclude, for any purposes, the statements of an eye witness, Desiree Wilson, which statements were not provided to the Defendant in response to his request for discovery materials until the date before the witness was scheduled to testify?"

3

7. "Did the Trial Court err and deny to the Defendant a fair trial and due process by granting to the Commonwealth the right to use in rebuttal, if it chose to so use, the statements of an eye witness, Desiree Wilson, when those statements were not provided to the Defendant in response to his request for discovery materials and which statements effected [s.p.] the Defendant's decision whether or not to testify at trial?"

8. "Did the Commonwealth present sufficient evidence to sustain the verdict of guilty for each count, including:

   A. Murder of the First Degree, 18 Pa.C.S. § 2502(a);

   B. Possession of a firearm prohibited, 18 Pa.C.S. § 6105(a)(1); and

   C. Firearms not to be carried without a license, 18 Pa.C.S. § 6106(a)(1)?"

9. "Was the verdict of guilty entered against the weight of evidence on each including:

   A. Murder of the First Degree, 18 Pa.C.S. § 2502(a);

   B. Possession of a firearm prohibited, 18 Pa.C.S. § 6105(a)(1); and

   C. Firearms not to be carried without a license, 18 Pa.C.S. § 6106(a)(1)?"

## Factual History

On or about June 20, 2012, the Defendant was arrested by the McKeesport Police Department on the arrest warrant of the City of Washington Police for charges, including Criminal Homicide, stemming from an incident on the night of May 23, 2012, through the early morning hours of May 24, 2012.

During the trial, the jury heard evidence that the City of Washington Police Department was called to Pickles bar on Ewing Street, in the City of Washington, early the morning of May 24, 2012, in response to a 911 call that shots were fired in the vicinity of Pickles bar. Patrolmen

4

Peter Jaskiewicz testified that he responded to the call. As he was en route to Pickles bar, an additional transmission from 911 reported that a man was shot outside of Pickles bar and that the shooter had fled down an alley away from the scene. Officer Jaskiewicz was first to arrive on the scene. He testified he observed the victim, a black male with dreadlocks wearing a white T-shirt and shorts, later identified as Rensfield Jarvis, lying in the street on his back near the entrance of Pickles bar.[7]

Officer Jaskiewicz testified that he observed gunshot wounds to the face and below the sternum of the victim's chest. A faint heart beat was initially detected. However when EMS arrived on the scene, the victim had expired.[8] Coroner Timothy Warco pronounced the victim dead at the scene.[9] Officer Jaskiewicz and Sergeant Ronald Aiello testified they observed fragmented bullet rounds lying around the victim's body, including a bullet jacket and bullet slug at the scene.[10]

Eye witness testimony and surveillance video from inside the bar revealed that a man with the white T-shirt, later identified as Mr. Jarvis, had been followed out of the bar by a black male wearing a black shirt, jean shorts and a red baseball cap. Behind the two men were two women, April Lash and Kayla Cunningham, who exited after them.[11]

Witness Mark Jones testified that at one point that evening the victim extended his hand to the man with the black T-shirt and red baseball hat on, but the man with the red baseball hat had smacked the victim's hand away. However, other testimony from bar patrons and staff

---

[7] TT 6-10. (The numerals following the initials TT refer to the official transcript of the jury trial proceedings conducted from September 10, 2013 through September 13, 2013.)
[8] TT 8-9.
[9] TT 125-127.
[10] TT 9; 203-209.
[11] TT 15; 46; 66-67.

5

revealed that the victim and the man with the black T-shirt and red baseball hat were not seen arguing or conversing in the bar.[12]

Testimony demonstrated that after Ms. Lash and Ms. Cunningham exited the bar, they walked towards Ms. Cunningham's car and the two black males who walked out of the bar ahead of them were standing in the parking lot together. As Ms. Lash approached the passenger door to the car, she testified that she saw the victim and the man with the red baseball hat standing in the parking lot together. As she entered the vehicle, Ms. Lash heard three gunshots. It was established that no other individuals were in the area. Ms. Cunningham likewise testified that she saw the men standing together and as she approached her vehicle she heard the first shot she then looked out and saw sparks from the other two shots fired by the man with the black T-shirt and red baseball hat. Mark Jones, who was standing outside of Pickles bar, testified he observed the man with the red baseball hat with a gun in his hand pull the trigger. The witness also saw flashes from the second and third shots as he ducked behind a parked vehicle. [13] [14]

After the shots were fired, the victim then grasped his chest and fell to the ground. The man with the red baseball hat remained standing there for a few seconds and then ran off through the back of the parking lot towards an alley. Ms. Lash and Ms. Cunningham then immediately ran back to the bar and informed the staff and patrons that someone had been shot and to call 911.[15]

On the evening of May 23, 2012, Amber Barrows was bartending at Pickles when she noticed the man with the black shirt and red baseball hat come in alone. Ms. Barrows had seen the man at the bar on a previous occasion and testified that she knew him by his nickname

---

[12] TT 18; 86; 236.
[13] TT 66-69; 82.
[14] Note: On cross examination Mr. Jones said he only saw shadow of handgun in his hand and that "he had it in his hand" TT 82.
[15] TT 47-50; 61-63; 68-69; 71-74; 81; 88; 177-185; 190-193.

"Henny." Ms. Barrows testified that this was the second occasion in which she had seen "Henny" and that they exchanged names and had light conversation at the bar that evening. Ms. Barrows' identification of the man she knew as "Henny" gave rise to the charges against Defendant. Ms. Barrows also identified Henny as the Defendant, Henry Dion Williams, in the courtroom.[16]

Ms. Barrows testified that, later in the evening she observed Mr. Jarvis and the Defendant leave the bar. Shortly thereafter, Ms. Lash and Ms. Cunningham rushed back into the bar and shouted someone had been shot. Ms. Barrows also provided police with sunglasses the Defendant left sitting on a ledge by the pool table.[17] [18] Video surveillance of the bar revealed that Defendant was wearing sunglasses as he entered Pickles.[19]

Washington City Police were called to the home of Richard Steele on May 24, 2012, after his 9-year-old son found a gun located beside their trash can in their backyard. Mr. Steele lives approximately one block away from Pickles bar. On that afternoon he and his son were walking down the sidewalk when his son walked off to the right and saw a weapon lying underneath a piece of cardboard next to their trash can.[20] Lieutenant Daniel Stanek of the Washington City Police Department testified that he recovered a weapon from Mr. Steele's residence after a call was received that a firearm had been located there. The weapon was identified as a .357 Sturm Ruger revolver. After closer examination, Lt. Stanek determined that the revolver's cylinder contained three unfired, full rounds, and three spent shell casings, indicating rounds which were

---

[16] TT 100-112.
[17] TT 100-112; 117-118; 121-122.
[18] Note: Ms. Barrows identified Defendant on surveillance camera with sunglasses on and off.
[19] TT 234-235.
[20] TT 91-94.

7

discharged. The gun recovered was registered to a Mr. Donald Ament, and at that point it, had not been reported stolen.[21]

Donald Ament testified at trial that he had reported that his house was burglarized in March of 2007. Mr. Ament reported 4 handguns were stolen, one of which was a .357 Sturm Ruger handgun. The person who burglarized the home, Michael Todd Booher, was prosecuted. Mr. Ament's property, including the Sturm Ruger handgun, was never returned.[22]

Corporal Andrew Pannelle, qualified as an expert in the field of latent print examination, examined the .357 Sturm Ruger, and determined that there were no identifiable latent fingerprints on the firearm.[23] Sergeant Antonio Ferraro of the Pennsylvania State Police, an expert in the field of forensic firearms and tool marking examination, also examined the revolver, and determined that it contained three discharged cartridge cases and three undischarged cartridges. Sergeant Ferraro concluded that signature markings, individual characteristics imparted onto the bullet during discharge, revealed that the patterns of the two discharged bullet jackets were discharged from the firearm recovered. He also determined that the cartridge cases, when examined in comparison to cartridges test fired, indicated that the three discharged cartridges were discharged from the recovered Sturm Ruger revolver.[24]

Lieutenant Daniel Stanek testified that he obtained a search warrant for a black Lincoln Continental vehicle left at the scene. The video surveillance cameras from the street showed the vehicle arriving at the bar at approximately 10:00 p.m. and the Defendant entering the Pickles moments afterwards. The vehicle had been parked near Pickles and was there when Detective Stanek arrived at the scene. The vehicle was registered to Valerie Clark, the Defendant's mother.

---

[21] TT 132-137; 143-148.
[22] TT 268-272.
[23] TT 152-157.
[24] TT 164-167; 171-173.

8

An envelope was recovered from the glove box of the Lincoln Continental, which contained court documents from varying magisterial districts, all bearing the name of the Defendant, Henry Dion Williams.[25]

Forensic Pathologist, Dr. Leon Rozin, performed an autopsy on the victim. Trauma was observed on the chest, face and both shoulders. There was a gunshot wound with entrance and exit on the chest of the decedent, which was determined to pierce the heart and right lung. The gunshot to the face went in the right cheek and through the left cheek, exited and grazed the victim's left shoulder. The right shoulder was also shot, but was just penetrated superficially. No abrasions were found on the victim's hands. There was no indication the victim had been engaged in a fight. The cause of death was a fatal gunshot wound of the chest, damage to the heart, right lung and severe internal bleeding. Manner of death, homicide. [26] Coroner Timothy Warco reviewed the autopsy report and also concluded that the victim's cause of death was due to a gunshot wound to the chest and the manner of death was deemed a homicide. No weapons were found on the person of the victim.[27]

## OPINION

The Defendant raises nine issues for the Court's consideration in this direct appeal from the Trial Court's Judgment of Sentence.

The Defendant first contends that the Trial Court erred when it denied the Defendant's Motion to Dismiss under Pa.R.Crim.P. 600. A hearing was held on September 6, 2013, to address this claim.

---

[25] TT 201-202; 208-209; 226-234; 247-251.
[26] TT 214-221.
[27] TT 125-127.

9

At the hearing, it was determined that the criminal complaint was filed May 24, 2012. The Commonwealth argued there was a myriad of events that resulted in a total of 160 days of excludable time, and that due diligence was exercised in bringing the case to trial.[28]

The first period of excludable time was the time from which the criminal complaint was filed, May 24, 2012, and the arrest warrant issued until the Defendant was apprehended. The Defendant was arrested on June 20, 2012, thus the Commonwealth argued that these 27 days should be excluded.

The Commonwealth additionally argued that there were 90 days of excludable time accredited to the Omnibus Pre-trial Motion filed by Defense counsel on November 15, 2012. The Court ruled on those motions on February 13, 2013.

Finally, the Commonwealth argued that while this matter was set for the February trial term in the Case Management Order filed on September 24, 2012, the Commonwealth was obligated to call two cases with earlier filing dates for the February and April trial terms, and the Court's calendar and packed schedule prevented the Commonwealth from calling the case at an earlier term.[29] Accordingly, there was an additional 43 days of excludable time. By this argument, the new run date should have been November, 1, 2013.[30]

Conversely, Defense counsel argued that there was no excludable time attributable to the Defendant. Notably, Defense counsel that argued no continuances were filed by the Defendant and the Commonwealth did not use due diligence in bringing the case to trial within the required period of time. The Defense also emphasized that the Case Management Order entered into the record was at the Commonwealth's request, and the Defendant was available at all times.

---

[28] Rule 600 Hearing Transcripts 3-6. (The numerals following the initials RSHT refer to the official transcript of the Rule 600 proceedings conducted on September 6, 2013).

[29] February trial term began February 25, 2013, and concluded March 8, 2013. April trial term began April 1, 2013.

[30] RSHT 3-6.

Defense counsel further argued that the of filing pre-trial motions does not make the Defendant unavailable, and the 90 days taken up by the pre-trial motion should not be attributed to the Defendant. Finally, Defense counsel argued that the time between the filing of the criminal complaint on May 24, 2012, and the arrest of the Defendant on June 20, 2012, should not be excludable time because no Fugitive Notice was filed.

Rule 600 of the Pennsylvania Rules of Criminal Procedure provides that trial must commence within 365 days:

> (A)(2) Trial shall commence within the following time periods.
> (a). Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.
> [ . . . ]
> (C)(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.[31][32]

The Trial Court found that, as set forth herein, the Commonwealth acted within the parameters and purpose of Pa.R.Crim.P. 600. When evaluating Rule 600 issues, the "standard of review of a trial court's decision is whether the trial court abused its discretion. . . . The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court."[33][34]

---

[31] Pa.R.Crim.P. 600.

[32] In the context of Rule 600, there is a distinction between "excludable time" and "excusable delay." Unlike 'excludable time,' . . . 'excusable delay' is not expressly defined in Rule 600, but the legal construct takes into account delays which occur as a result of circumstances beyond the Commonwealth's control and despite its due diligence. *Commonwealth v. Frye*, 909 A.2d 853, 858 (Pa. Super. 2006);(internal citations omitted).

[33] *Commonwealth v. Peterson*, 19 A.3d 1131, 1134-1135 (Pa.Super. 2011).

[34] Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused. *Commonwealth v. Peterson*, 19 A.3d 1131, 1134-1135 (Pa.Super. 2011).

11

In making its determination, the Trial Court first took under consideration the principles supporting Rule 600:

> This Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. . . . So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime.[35]

In order to balance these rights, the crux of the inquiry must be:

> Whether the Commonwealth exercised due diligence, and whether the circumstances occasioning the delay of trial were beyond the Commonwealth's control. . . . Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort.[36] [37]

Reasonable effort, "includes such actions as the Commonwealth listing the case for trial prior to the run date to ensure that the defendant was brought to trial within the time prescribed by Rule 600."[38]

The Trial Court found that due diligence was exercised by the Commonwealth from May 24, 2012, when the arrest warrant was filed, until the apprehension of the Defendant on June 20, 2012. In a Comment to Pa.R.Crim.P. 600, it is expressly stated:

> For purposes of paragraph [Pa.R.Crim.P. 600] (C)(1) . . . the following periods of time, that were previously enumerated in the text of former Rule 600(C), are examples of periods of delay caused by the defendant. This time must be excluded from the computations in paragraphs (C)(1)[ . . .]
> (1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence.[39]

---

[35] *Commonwealth v. Peterson*, 19 A.3d 1131, 1135 (Pa.Super. 2011).
[36] *Commonwealth v. Selenski*, 994 A.2d 1083, 1088-1089 (Pa. 2010); citing *Commonwealth v. Hill*, 736 A.2d 578, 588 (Pa. 1999).
[37] Pa.R.Crim.P. 600 was amended in 2012. In the explanatory Comments to Rule 600, the quotation listed in footnote 36 from *Commonwealth v. Selenski*, 994 A.2d 1083 (Pa. 2010) is cited. Additionally, the quotation was recently cited in *Commonwealth v. Davis*, 86 A.3d 883, 891 (Pa.Super. 2014).
[38] *Commonwealth v. Hunt*, 858 A.2d 1234, 1242 (Pa. Super. 2004).
[39] Pa.R.Crim.P 600-Comment.

12

At the Rule 600 hearing, Lt. Stanek testified that he immediately attempted to locate the Defendant by various means including: current cell phone number; current and recent addresses attributed to him; facsimile and emailed copies of the arrest warrant to the Chartiers police department, where the Defendant was thought to be located; communication with the Defendant's mother; contact with Allegheny County Adult Probation, where the Defendant had open cases. Lt. Stanek further stated that the Defendant's information was placed in the NCIC network, and his information was released to major media outlets, including local television stations and the local newspaper, the Washington Observer Reporter.

The Defendant was apprehended by the McKeesport Police Department on June 20, 2012. The arrest warrant was executed by McKeesport Police at an address not in the possession of Lt. Stanek. At the Rule 600 hearing, Lt. Stanek testified that a Fugitive Notice from the Magisterial District Justice was not sought for the Defendant. He explained that a Fugitive Notice is not typically exercised until all other means are exhausted, which is determined on a case-by-case basis. At that juncture in the investigation, Lt. Stanek was under the belief the Defendant would be located and apprehended.[40]

The Trial Court found that the prosecution took all steps available to apprehend the Defendant and demonstrated due diligence during that time.

A Case Management Order was filed on September 24, 2012, at the request of the Commonwealth and at the consent of the Defense, delineating that discovery was to be completed by October 15, 2012, pretrial motions filed by November 15, 2012, a pretrial conference scheduled for January 9, 2013, and trial set for February 2013.

The Defendant filed an Omnibus Pretrial Motion on November 15, 2012, and a hearing was held on the matter on January 9, 2013. The Trial Court filed its decision on the motions on

---

[40] RSHT 7-22.

13

February 13, 2013. The Defense asserts that the time from the filing of Defendant's Omnibus Pretrial Motions and the Court's decision does not make the Defendant unavailable and that time should not be attributed to the Defendant because trial was set for February in the Case Management Order, whether Pretrial Motions were filed or not.

The Court finds that time was indeed excludable. The Court acknowledges:

> The mere filing of a pretrial motion by a defendant does not automatically render him unavailable. Rather, a defendant is only unavailable for trial if a delay in the commencement of trial is caused by the filing of the pretrial motion. . . . If a delay is created, in order to establish that the delay is excludable, the Commonwealth must demonstrate by a preponderance of the evidence, that it exercised due diligence in opposing or responding to the pretrial motion.[41]

Moreover, at the outset of the case, the Case Management Order was agreed to by all parties. Defense counsel willingly consented and raised no objection to the issuance of the Case Management Order. Additionally, the Case Management Order in fact benefited the Defendant.

Pa.R.Crim.P. 579 reads in pertinent part, "except as otherwise provided in these rules, the omnibus pretrial motion for relief shall be filed and served within 30 days after arraignment."[42] The Defendant was formally arraigned on July 25, 2012. Clearly, Defendant's Omnibus Pretrial Motions were not filed within the time designated by the Rule. The Case Management Order permitted the Defendant to file his motions and make those claims. Moreover, even if the Defendant wished to bring the matter to Court in January or an earlier month, the pending ruling on the Pretrial Motion prevented such action, even though such a request was never made by the Defendant.

Finally, the Court avers that no other judges of the Washington County Court of Common Pleas were available to try this matter during that time period. The Defense argued in

---

[41] *Commonwealth v. Lynn,* 815 A.2d 1053, 1059 (Pa.Super. 2003); quoting *Commonwealth v. Hill,* 558 Pa. 238, 736 A.2d 578, 587 (1999).
[42] Pa.R.Crim.P. 579(A).

the Rule 600 hearing that the Commonwealth has a duty to seek out another Court to hear the case if the assigned Court is unavailable. This claim is frivolous.

In *Commonwealth v. Anderson*, 959 A.2d 1248 (Pa.Super. 2008), a case the Defendant cited, the Superior Court noted, "the extent to which the Commonwealth must look for other available courtrooms is not clear."[43] In another case cited by the Defense, *Commonwealth v. Hawk*, 597 A.2d 1141(Pa.Super. 2008), the Superior Court determined that the Commonwealth did not exercise due diligence when they did not seek another judge. However, that case was decided under different circumstances, where the assigned trial judge was ill for 5 weeks and then on vacation for an additional 4 weeks.

The Superior Court set forth in *Commonwealth v. Riley*, 19 A.3d 1146 (Pa.Super. 2011):

> Because the Commonwealth cannot control the calendar of a trial court, delay occasioned by the court's unavailability is usually excusable. However, the Commonwealth may, under some circumstances (*e.g.* a prolonged judicial absence), have a duty to seek other courtrooms to try the case. The extent of this duty depends on the specifics of each case. The guiding principle is, again, that the Commonwealth must exercise due diligence by putting forth a reasonable effort in light of the particular case facts.[44]

During the entire 2013 calendar year, the Washington County Court of Common Pleas bench was one-third absent, due to the retirement of Judge Janet Moschetta-Bell and Judge Paul Pozonsky. Accordingly, an excessive number of criminal cases were assigned to Judge Katherine Emery and to the undersigned. There was no available judge to substitute for a homicide trial. Such delays encountered during the pendency of the case was clearly beyond the Commonwealth's control, and the Commonwealth exercised due diligence and reasonable efforts in bringing this matter to trial, as evidenced by setting the trial for the February trial term, which was well before the original run date of May 24, 2012.

---

[43] *Commonwealth v. Anderson*, 959 A.2d 1248, 1250 (Pa.Super. 2008).
[44] *Commonwealth v. Riley*, 19 A.3d 1146, 1149 (Pa.Super. 2011); citing: *Commonwealth v. Trippett*, 932 A.2d 188, 198 (Pa.Super.2007); citing: *Commonwealth v. Anderson*, 959 A.2d 1248, 1250 (Pa.Super.2008); (citations omitted).

15

The Trial Court properly inquired as to the Commonwealth's diligence in bringing this matter to trial. The Court places significant emphasis on the importance in the safety and protection of the general public in a matter as serious as a homicide, and its interest in punishing and deterring crime. The record demonstrates that the Commonwealth exercised due diligence to bring the Defendant to trial within the time prescribed by Rule 600. Accordingly, the Trial Court's decision to deny Defendant's Motion to Dismiss under Pa.R.Crim.P. 600 was proper.

The Defendant next claims the trial court erred when it allowed a Commonwealth witness, Detective Ronald Aiello, to present testimony of a prior consistent statement provided to him by another Commonwealth witness, Kayla Cunningham, after that witness had concluded her testimony.

On direct examination, Kayla Cunningham was shown a surveillance video from Pickles bar. During the course of the video, Kayla Cunningham identified the shooter, the Defendant. On cross-examination, Kayla Cunningham was questioned extensively about the person she identified as the shooter and what she witnessed prior to, during and following the shooting.[45] Sergeant Ronald Aiello was subsequently called to testify.

Sgt. Aiello testified that he spoke to Kayla Cunningham at the scene of the crime. During that interview, amongst other things, Ms. Cunningham described the shooter. At one point during direct examination, Sgt. Aiello was asked to read from his report the statement Kayla Cunningham gave describing the shooter, to which Defense counsel objected. Defense counsel asserted that any testimony by Sgt. Aiello regarding statements made by Ms. Cunningham constituted hearsay and should have been developed during her testimony.[46]

> Mr. Lucas: With regard to [Ms. Cunningham's] statement to you how did she describe the shooter?

---

[45] TT 179.
[46] TT 195-196.

16

Mr. Alterio: Objection, Your Honor. Ms. Cunningham has testified. She could have given that information on direct testimony as it pertains to it would be hearsay.

Mr. Lucas: We submit that insomuch as she has testified to prior consistent statements she has been subject to cross examination.

Mr. Alterio: Your Honor, she has not seen the officer's report. She has not initialed it and indicated that is in fact what she told the officer, so it would not be admissible at this point in time.[47]

The standard of review when ruling on the admissibility of evidence is well settled:

Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.[48]

The Court submits that the statement was admissible as a prior consistent statement to rehabilitate Ms. Cunningham's testimony identifying the shooter.

(c) Witness's Prior Consistent Statement to Rehabilitate. Evidence of a witness's prior consistent statement is admissible to rehabilitate the witness's credibility if the opposing party is given an opportunity to cross-examine the witness about the statement and the statement is offered to rebut an express or implied charge of: (1) fabrication, bias, improper influence or motive, or faulty memory and the statement was made before that which has been charged existed or arose;[49]

In *Commonwealth v. Swinson*, 626 A.2d 627 (Pa.Super. 1993), the Superior Court determined that a Detective was permitted to read from his report statements made to him by a victim/witness during an interview regarding the incident in question. The Superior Court opined that the witness was subject to extensive cross-examination and that the statement was merely a

---

[47] TT 195-196.
[48] *Commonwealth v. Handfield*, 34 A.3d 187, 207-08 (Pa. Super. 2011).
[49] Pa. R. Evid. 613.

17

prior consistent statement offered to rehabilitate the witness, whose credibility was attacked by way of faulty memory.[50]

The Trial Court finds the *Swinson* reasoning analogous and persuasive to the matter at bar. A review of the transcripts revealed that Ms. Cunningham was subject to extensive cross-examination of her recollection of the events on May 24, 2012, with the design of casting doubt on her memory and general credibility. Therefore, it is not error for the Trial Court to permit Sgt. Aiello's testimony to rehabilitate and rebut any claim of inconsistency with respect to Ms. Cunningham's testimony.

Defendant next asserts that a new trial should be granted because the Trial Court erred when it allowed a Commonwealth witness, Lieutenant Daniel Stanek, to present hearsay testimony regarding information provided to him by Defendant's mother, Valerie Clark, when that witness did not testify and when such testimony by Lt. Stanek was beyond the scope of cross examination.

During the course of cross examination, Lieutenant Stanek testified:

Mr. Alterio: You mentioned a black Lincoln?

Lt. Stanek: Yes.

Mr. Alterio: And it being impounded?

Lt. Stanek: Yes.

Mr. Alterio: I don't know if you actually impounded it, but—

Lt. Stanek: It was my decision, yes.

Mr. Alterio: And it was taken, I believe, as seen in the photographs?

Lt. Stanek: No. It goes to Eisenminger's.

---

[50] *Commonwealth v. Swinson*, 626 A.2d 627, 632-633 (Pa.Super. 1993).

18

Mr. Alterio: I'm sorry. The photographs of the vehicle show the entire vehicle, front, passenger side, rear, driver's door?

Lt. Stanek: Yes.

Mr. Alterio: And you also look at the vehicle before it was photographed, correct?

Lt. Stanek: I had observed it at the scene. Once we had it impounded we couldn't get it – we had other things we were doing – we couldn't get the warrant till later on. So when we went back down we photographed it again before we go into it. So that's what you see going around, Detective Aiello is hitting all corners.

Mr. Alterio: It would not have been driven from the scene, it would have been towed?

Lt. Stanek: Yes. It was put on a flatbed.

Mr. Alterio: Before it was put on the flatbed did you actually observe it?

Lt. Stanek: You mean when it was on Ewing Street? Absolutely. Yes.

Mr. Alterio: Once it got back to the garage where it was impounded you viewed it?

Lt. Stanek: Yes.

Mr. Alterio: To your knowledge had it changed in any manner?

Lt. Stanek: No.

Mr. Alterio: Was one or more than one of the tires on the vehicle flat?

Lt. Stanek: No, they were not.

Mr. Alterio: None of them?

Lt. Stanek: No.[51]

On redirect examination, the Commonwealth asked Lt. Stanek:

Mr. Lucas: Mr. Alterio asked you about that Lincoln vehicle and I believe during brief direct that you had answered questions about the person you talked to about that vehicle?

Lt. Stanek: Yes, Valerie Clark.

---

[51] TT 247-248.

19

Mr. Lucas: What was her relationship to Mr. Williams?

Lt. Stanek: It's his mother. She's sitting right over there in the courtroom.

Mr. Lucas: When did you have that discussion with her?

Mr. Alterio: Objection, Your Honor. Beyond the scope of cross.

The Court: Overruled.

Lt. Stanek: I'd have to refer to a report. I actually tried to call her several times and she tried calling me. I think it was a couple of days after that we were actually able to communicate. It could have been the 25th. I'm not sure. I actually have a supplemental regarding that information.

Mr. Lucas: 27 days later?

Lt. Stanek: No. Absolutely not.

Mr. Lucas: 27 days after this, what happened on that day?

Mr. Alterio: Objection, Your Honor. Beyond the scope of cross.

The Court: Overruled.

Lt. Stanek: That's when Mr. Williams was located in McKeesport and taken into custody for the homicide upon a warrant.

Mr. Lucas: The location in McKeesport, did it match any of the addresses on the documents that were inside that Lincoln?

Lt. Stanek: No.[52]

First, the Court finds that no hearsay was entered into evidence during redirect examination of Lt. Stanek.

> (c) Hearsay. "Hearsay" means a statement that:
> > (1) the declarant does not make while testifying at the current trial or hearing; and
> > (2) a party offers in evidence to prove the truth of the matter asserted in the statement.[53]

---

[52] TT 251-252.
[53] Pa.R.E. 801.

20

As clearly illustrated above, during redirect examination, Lt. Stanek testified as to whom he had spoken, Valerie Clark, and when he had spoken to her. There was no out of court statement made by Ms. Clark or Lt. Stanek offered into evidence.[54]

Moreover, as the record reflects, Defense counsel made no objection regarding any alleged hearsay. It has long been held, "failure to raise a contemporaneous objection to the evidence at trial waives that claim on appeal."[55]

Pennsylvania Rule of Appellate Procedure 302(a) states:

General rule. Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.[56]

The Court further finds that the prosecution's redirect examination was proper. "The scope of redirect examination is largely within the discretion of the trial court."[57] Generally, "redirect examination is limited to answering only such matters as were drawn out in the immediately preceding examination."[58]

The Court submits that the Commonwealth's questions did not go beyond the scope of cross examination when the prosecution raised questions related to the black Lincoln vehicle found at the scene. Defense counsel questioned Lt. Stanek as to the condition and whereabouts of the Lincoln, as well as the extent of the investigation of the vehicle. The Trial Court found this line of questioning prompted the Commonwealth to clarify for the jury the purpose of the investigation.

---

[54] (a) Statement. "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion. Pa.R.E. 801.

[55] *Commonwealth v. Thoena Tha*, 64 A.3d 704, 713 (Pa.Super. 2013); *citing: Commonwealth v. Pearson*, 685 A.2d 551, 555 (Pa.Super. 1996).

[56] Pa.R.A.P. 302(a).

[57] *Commonwealth v. Fransen*, 42 A.3d 1100, 1117 (Pa.Super. 2012) *appeal denied*, 76 A.3d 538 (Pa. 2013); quoting: *Commonwealth v. Dreibelbis*, 426 A.2d 1111, 1117 (1981); quoting: *Commonwealth v. Hoover*, 16 A.3d 1148, 1150 (Pa.Super. 2011). (citations omitted).

[58] *Commonwealth v. Carpenter*, 617 A.2d 1263, 1266 (1992).

21

It has also been recognized "that a trial judge has wide discretion to vary the normal order of proof and may permit a party to bring out on re-direct examination relevant evidence which inadvertently the party failed to bring out on direct examination."[59]

During direct examination the prosecution inquired:

Mr. Lucas: Lt., if you could, tell the jury who that vehicle was registered to.

Mr. Stanek: Valerie Clark.

Mr. Lucas: Did you make any efforts to contact Ms. Clark.

Lt. Stanek: Yes.

Mr. Lucas: Were you successful?

Lt. Stanek: Yes.

Mr. Lucas: In the course of that conversation with Ms. Clark did you tell her – I'm not asking for anything she said – but did you tell her why you were interested in the vehicle and in Mr. Williams?

Lt. Stanek: Yes.

Mr. Lucas: Did you inform her of any pending court action against Mr. Williams?

Lt. Stanek: Yes.

Mr. Lucas: What did you tell her?

Lt. Stanek: I explained we had a homicide warrant for him.

Mr. Lucas: Lt., did you also obtain a search warrant to search that vehicle?

Lt. Stanek: Yes.[60]

The Commonwealth's questions on redirect examination were relevant to the above line of questioning on direct examination to complete the record. Accordingly, the Commonwealth's questions fall within the recognized rules regarding the scope of redirect examination. The Trial

---

[59] Hon. Mark I. Bernstein, Pennsylvania Rules of Evidence with Comments and Annotations 459 Gann Law Books 2007edition;citing: *Commonwealth v Brown,* 342 A.2d 84, 91 (Pa. 1975).
[60] TT 226.

22

Court did not abuse its discretion when it permitted Lt. Stanek to testify to his knowledge of the Lincoln on redirect examination when Defense Counsel questioned him at length as to such knowledge on cross examination. The assignment of error by the Defendant does not merit the relief requested.

The Defendant also moves for a new trial on the basis that the trial court erred in allowing a Commonwealth witness, Lt. Daniel Stanek, to present testimony which he argues was speculative in nature regarding the truthfulness and accuracy of the testimony of the Commonwealth's witnesses, Kayla Cunningham and April Lash.

This claim has no merit. During cross examination Defense counsel asked a series of questions regarding the view of a security camera mounted on a telephone pole outside of the bar. Defense counsel queried as to why Ms. Lash and Ms. Cunningham were seen crossing the parking lot, but were not in view of the video surveillance when returning to the bar following the shooting, as consistent with their testimony. In response the prosecution inquired on redirect examination:

> Mr. Lucas: Lt., with regard to that pole camera the view primarily is just straight across at Pickle's?
>
> Lt. Stanek: Yes.
>
> Mr. Lucas: The direction of travel of Kayla and April when they went to their vehicles across the street was in a diagonal fashion going to the parking lot?
>
> Lt. Stanek: Yes.
>
> Mr. Lucas: And the parking lot obviously is where the shooting occurred?
>
> Lt. Stanek: Yes.
>
> Mr. Lucas: Does it surprise you that you did not see them go back across-
>
> Mr. Alterio: Objection. Speculation on the part of the witness.

The Court: If you know. Overruled. [...]

Lt. Stanek: No. They are running back in away from the shooting that they just observed. There is no doubt that they ran back into the bar. You saw the footage. They are definitely coming back into the bar. They didn't go anywhere else.[61]

"A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."[62] Lt. Stanek testified to his knowledge of the circumstances based on his review of evidence, including eye witness testimony and the surveillance camera images, both of the inside of the bar and the parking lot.

As noted above, "the admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion."[63] The Trial Court merely exercised its discretion in accordance with the law and properly overruled the objection by the Defense. The Defendant is entitled to cross examination to challenge the witness' knowledge in regard to his testimony. The jury is free to evaluate the testimony and accept or reject the testimony. Lt. Stanek's testimony was supported by a litany of evidence for the observed facts, leading him to testify that the facts were consistent with the particular scenario. Lt. Stanek's testimony that Ms. Lash and Ms. Cunningham returned to the bar following the shooting, although outside of the view of the pole camera, was consistent with all eye witness testimony, including Ms. Lash, Ms. Cunningham, Mr. Jones and Ms. Barrows, as well as the cameras inside of the bar viewing the two women returning to the bar.

The Trial Court finds that the testimony was properly admitted, and to the extent the officer's testimony may have been improperly admitted, its admission was harmless error.

---

[61] TT 250.
[62] Pa. R. E. 602.
[63] *Commonwealth v. Murray,* 83 A.3d 137, 155-56 (Pa. 2013); citing: *Commonwealth v. Mitchell,* 902 A.2d 430, 452 (2006); *Commonwealth v. Chamberlain,* 612 Pa. 107, 30 A.3d 381, 422 (2011); (citations omitted).

The doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that a defendant is entitled to a fair trial, but not a perfect one.[64]

The Court finds that any error in the admission of Lt. Stanek's statement regarding the route from the parking lot back to the bar taken by Ms. Lash and Ms. Cunningham after the shooting was harmless error because the statement was merely cumulative of eye witness testimony and the surveillance video.

The Trial Court properly exercised its discretion and accordingly the Defendant is not entitled to relief based on his claim that Lt. Stanek's statement was improperly admitted.

Defendant also asserts that he is entitled to a new trial because the Trial Court erred in allowing the introduction of testimony by Lt. Daniel Stanek regarding gunshot residue evidence when said witness was not qualified as an expert in the field of gunshot residue evidence.

The testimony complained of is as follows:

Mr. Lucas: Lt., in the course of this trial there's been testimony that the victim's hands were bagged at the scene and that swabs were taken of the victim's hands at autopsy?

Lt. Stanek: Correct.

[...]

Mr. Lucas: Did you submit these swabs for further analysis at the Greensburg lab?

Lt. Stanek: No, I did not.

Mr. Lucas: Can you explain to the jury why you didn't?

Lt. Stanek: Yes. In these types of cases my experience is in past cases the lab will not perform the test.

---

[64] *Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012), *cert. denied.* 133 S. Ct. 2336, (U.S. 2013); citing: *Commonwealth v. Thornton*, 431 A.2d 248, 251 (Pa. 1981).

25

Mr. Lucas: Have you had instances where they've been refused?

Lt. Stanek: Yes. We've actually submitted them and had them returned. We've actually consulted and had them say: don't send it.[65]

Defendant contends that Lt. Stanek offered expert testimony, when he was not qualified to do so, when he testified that the reason he did not send gunshot residue to be tested was because he believed the experts would not perform the test.

The Court finds the Defendant's assignment of error to be without merit. Lt. Stanek did not testify that he discussed with experts whether he should or should not send the swabs for examination and they informed him not to send it because he would not receive a result. He did not offer testimony, expert or layperson, as to what the result of a gunshot residue test would or would not reveal. He offered testimony only as to *why* he did not submit the swab for a gunshot residue test. Further, the underlying premise for his decision not to send the gunshot residue was based on his own prior experiences. As reflected above, Lt. Stanek testified that, based on his prior experiences, the crime lab would not perform the test at trial.

Following Lt. Stanek's testimony, defense counsel had an opportunity to cross examine the witness or to call an expert to rebut the Lt. Stanek's testimony regarding the propriety of lab testing. However, that avenue was not explored. The Court submits that the testimony by Lt. Stanek as to why the swabs were not submitted for testing is not expert testimony and the testimony was properly admitted.

Defendant further claims that he is entitled to a new trial due to the Court's error in denying the Defendant's Motion to Exclude for any purpose the statements of an eye witness, Desiree Wilson, which statements were not provided to the Defendant in response to his request for discovery materials until the date before the witness was scheduled to testify at trial.

---

[65] TT 312-318.

26

Near the conclusion of the Commonwealth's case-in-chief, the prosecution disclosed that police had interviewed an additional witness, Desiree Wilson. The prosecution came to learn about Ms. Wilson through a confidential informant. The informant submitted a report and statement to Lt. Stanek of his understanding of Ms. Wilson's knowledge of the incident. However, in order to inquire as to any knowledge of Ms. Wilson regarding the homicide, it was necessary for the prosecution to compromise the identity of the confidential informant. The prosecution initially decided not to pursue this avenue, so Ms. Wilson was never interviewed.

During the course of trial, the Commonwealth made contact with Ms. Wilson about her knowledge and the informant agreed to the Commonwealth's strategy and was willing to come forward. Ms. Wilson was then interviewed on September 12, 2013. The defense was also given the opportunity to interview Ms. Wilson on September 12, 2013. During the course of those interviews, Ms. Wilson revealed that on the night of the murder, the Defendant made a cell phone call to her and asked her to pick him up near the crime scene. Also, the next day Defendant called her and asked her to go pick up the gun used in the shooting, and disclosed to her where to find the weapon. Ms. Wilson then reached out to the informant. The informant directed her to not assist the Defendant in any of his requests.

Defense counsel argued that the Commonwealth and police had knowledge of this information for an extended period of time and under Pa.R.Crim.Pro.573, the Commonwealth was required to disclose this witness. Since the Commonwealth failed to timely disclose this in discovery, any testimony should be deemed inadmissible. Defense counsel also noted that this information would affect the strategy of the defense.

The Trial Court initially determined that the testimony was admissible and that the Commonwealth was excused from the mandatory discovery disclosure due to the nature in which

27

the information was uncovered from the informant. However, after further argument and reconsideration of the matter, the Trial Court determined that the information was required to be mandatorily disclosed as inculpatory evidence, and by not providing the evidence, it was unfair surprise to the defense.

> Pennsylvania Rule of Criminal Procedure 573 in relevant part states:
> (B) Disclosure by the Commonwealth
> (1) Mandatory:
> In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.
> [...]
> (b) any written confession or inculpatory statement, or the substance of any oral confession or inculpatory statement, and the identity of the person to whom the confession or inculpatory statement was made that is in the possession or control of the attorney for the Commonwealth;
> [...]
> (d) the circumstances and results of any identification of the defendant by voice, photograph, or in-person identification; [...][66]

The anticipated testimony of Ms. Wilson would indeed fall into the subsections listed above. Consequently, Desiree Wilson was not permitted to testify. No statements by Ms. Wilson were admitted into evidence, in any manner, for any purpose. In granting the defense motion to exclude this evidence, however, the Court indicated that Ms. Wilson could be called to testify as a rebuttal witness if the "door was opened." Accordingly, the Trial Court indeed granted the Defendant's Motion to Exclude statements and the Defendant's assignment of error is unsound.[67]

The Defendant also argues that the Court erred and therefore denied the Defendant a fair trial and Due Process by granting the Commonwealth the right to use in rebuttal, if it so chose to so use, the statements of eye witness, Desiree Wilson, as set forth above, when those statements

---

[66] 234 Pa. Code § 573.
[67] TT 279-312; 340-347.

28

were not provided to the Defendant in response to his request for discovery materials and which statements affected the Defendant's decision whether or not to testify at trial.

In the instant matter, as explained above, the reason the witness was not disclosed to the attention to defense counsel was due to the sensitive nature of the source of the information. During the course of trial, the Commonwealth deemed it necessary for Ms. Wilson to testify and the informant agreed to the Commonwealth's strategy. At that point, defense counsel was immediately notified and also was given the opportunity to interview Ms. Wilson that same morning. Mr. Lucas indicated that Ms. Wilson's interview revealed that she possessed more knowledge of the incident on May 24, 2012, than what was initially disclosed by the confidential informant.

As noted above, the Trial Court indicated that while it would not permit Ms. Wilson to testify during the Commonwealth's case-in-chief, she would be permitted to testify on rebuttal if the "door was opened." Defense counsel posits that the Defendant intended to testify that he was not the person who committed the shooting, but if Ms. Wilson testified during the Commonwealth's case-in-chief or rebuttal, then he would not testify and change his defense completely by arguing self-defense.[68] As a result of the Court's ruling, the Commonwealth rested.

The Defense called Anita Cunningham as their first witness. Ms. Cunningham testified that while standing on her porch in the early morning hours of May 24, 2012, she heard three gunshots. She testified that while she did not see the shooting, following the shots she saw a man with a hat on run down the street. In response, Ms. Cunningham called 9-1-1. She further

---

[68] TT 286; 297-298.

29

testified that the man she saw running appeared to be a "white man" because "he walked like a white man"[69]

After recalling Officer Stanek to testify briefly, the Defense rested. Outside the jury's purview, the Defendant was called and sworn. It was explained to the Defendant at length, by the Court and Defense counsel, his right to testify on his own behalf. The Defendant responded that he understood his right to testify and agreed with the strategy of defense counsel and opted not to testify on his own behalf.[70] The Defendant chose to exercise his Constitutional right and elected not to testify. There was then a discussion with the Trial Court and counsel whether the theoretical "door" had been opened for Ms. Wilson to testify due to the testimony of Anita Cunningham suggesting that another individual, a "white man", committed the murder. However, the Commonwealth elected to not call Ms. Wilson after the defense explained that the testimony presented was not intended to suggest that a "white man" committed the murder, but that defense witness Anita Cunningham was calling into question the eye witness accounts of April Lash, Kayla Cunningham and Mark Jones.[71] The Commonwealth accordingly withdrew their request to offer Ms. Wilson as a rebuttal witness.[72]

If prospective evidence is not in compliance with Pa.R.Crim.P.573, the rule dictates:

> (E) Remedy. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit discovery or inspection, may grant a continuance, or may prohibit such party from introducing evidence not disclosed, other than testimony of the defendant, or it may enter such other order as it deems just under the circumstances.[73]

---

[69] TT 320-334.
[70] TT 342-344.
[71] Note: Although during the prior discussion regarding Ms. Wilson's testimony, Defense counsel stated that Anita Cunningham would be offered to suggest another individual was the perpetrator. TT 297-298.
[72] TT 340; 347.
[73] Pa.R.Crim.P. 573.

30

The Trial Court submits that it properly fashioned a remedy in accordance with Pa.R.Crim.P. 573(e) based on the unusual circumstances of the case and for the reasons stated below.

Generally,

> The admission of rebuttal testimony is within the sound discretion of the trial court and the appropriate scope of rebuttal evidence is defined by the evidence that it is intended to rebut. Where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right. Rebuttal is proper where facts discrediting the proponent's witnesses have been offered.[74]

While declining the admission of Ms. Wilson as a witness for the Commonwealth's case-in-chief, the Trial Court determined that if any evidence presented by the defense, including testimony by the Defendant suggesting he was not the shooter, the Court would allow Ms. Wilson's testimony to be offered to impeach such testimony on rebuttal. However, the Court acknowledges this does not end our inquiry.

Pa.R.Crim.P. 573 requires mandatory disclosure of inculpatory evidence possessed by the Commonwealth to be disclosed when it is in their possession, but it has further been developed that:

> As a matter of due process, it is error to fail to provide evidence that will be used to impeach the credibility of defense witnesses. . . . It is true that we cannot expect the Commonwealth to anticipate the materiality of all possible rebuttal evidence [and] we can imagine cases in which the materiality of certain evidence in the Commonwealth's possession might not become apparent until after trial has begun. On the other hand, Rule [573] makes no distinction between rebuttal evidence and evidence the Commonwealth expects to use in its case-in-chief. In cases where the prosecutor can reasonably predict possible defense strategies and evidence, he must also be held to reasonable anticipation of what evidence in his possession might be material in rebuttal.[75]

---

[74] *Commonwealth v. Ballard*, 80 A.3d 380, 401-02 (Pa. 2013); quoting: *Commonwealth v. Fletcher*, 750 A.2d 261, 278 (Pa. 2000); citing: *Commonwealth v. Hughes*, 865 A.2d 761, 797 n. 40 (Pa. 2004). *Flowers v. Green*, 420 Pa. 481, 218 A.2d 219, 220 (Pa.1966).
[75] *Commonwealth v. Ulen*, 650 A.2d 416, 418 (Pa. 1994); citing *Commonwealth v. Jenkins*, 383 A.2d 195 (Pa. 1978); citing: *Commonwealth v. Jackson*, 319 A.2d 161 (Pa. 1974); citing: *Commonwealth v. Moose*, 602 A.2d 1265

When the Commonwealth improperly fails to disclose evidence, the pertinent question then becomes, "whether [the Commonwealth] could reasonably have predicted possible defense strategies. If it could, then the prosecutor will be held to reasonable anticipation of what evidence in his possession might be material."[76]

It was clear to the Trial Court, that although the Commonwealth was aware of the potential witness, police and the Commonwealth did not know the extent of Ms. Wilson's testimony until the Commonwealth's case developed during the course of trial. Had the Commonwealth known of Ms. Wilson's knowledge of the crime prior to trial, police certainly would have sought her out, interviewed her and provided that information to defense counsel. While it is foreseeable that Ms. Wilson's testimony may have been relevant, the Commonwealth did not have first-hand knowledge of her contact with Defendant after the crime. Furthermore, the Commonwealth was not made aware of any potential defense to be offered by Defendant.

In *Commonwealth v. Sullivan*, 820 A.2d 795 (Pa.Super 2003), the Superior Court found that the trial court did not err when it denied defendant's motion for mistrial when the Commonwealth offered testimony of a state trooper regarding his recollection of the defendant's statements to police after an incident that the defense claimed was an undisclosed inculpatory statement. The Court found there was no discovery violation when it reasoned:

> Although the disputed statement by Trooper Beaken can certainly be characterized as inculpatory, disclosure of such a statement under Rule 573(B)(1)(b) is limited by the express terms of the rule to any statement 'that is in the possession or control of the attorney for the Commonwealth.' The Commonwealth was not in possession of the disputed statement, therefore the prosecution had no obligation to provide it to the defense. Perhaps our Supreme Court will someday interpret its rule to apply to inculpatory statements in the

---

(Pa. 1992); quoting: *Commonwealth v. Thiel,* 470 A.2d 145, 148 (Pa. Super. 1983); citing: *Commonwealth v. Oliver,* 379 A.2d 309 (Pa. Super. 1977); (citations omitted).

[76] *Commonwealth v. Hanford*, 937 A.2d 1094, 1101 (Pa. Super. 2007); quoting: *Commonwealth v. Ulen*, 650 A.2d 416 (Pa. 1994); citing: *Commonwealth v. Thiel*, 470 A.2d 145, 148 (Pa. Super. 1983).

32

possession of the police but not known to the prosecution, as is the case for exculpatory statements by virtue of *Kyles* and *Burke*.[77]

The factual background of *Sullivan* is analogous to the matter at bar. As set forth on the record during trial, the police obtained Ms. Wilson's name from a confidential informant, but Ms. Wilson was never contacted or interviewed. As soon as Ms. Wilson was interviewed by police and it appeared that her testimony was relevant, material and inculpatory, Defense counsel was notified and given the opportunity to do the same. The Trial Court submits that the *Sullivan* reasoning is controlling and its principles should be consistently applied.

It should also be noted, "no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence."[78] [79] While the Court acknowledges that *"Brady"* violations reference mandatory exculpatory evidence, the Court submits that the matter at bar similarly entails mandatory disclosure of evidence, although inculpatory in nature. In this instance, the Trial Court asserts that the Defense had equal access to Ms. Wilson as a witness, who was Defendant's acquaintance. Based on the offer of Ms. Wilson's testimony, the Defendant contacted her on two separate accounts to assist him in locating a weapon as well as giving him a ride from the scene on the night of the crime. Obviously, the Defendant could have uncovered such evidence without

---

[77]*Commonwealth v. Sullivan*, 820 A.2d 795, 804 (Pa.Super. 2003); *citing: Commonwealth v. Dugger*, 486 A.2d 382, 386 (Pa. 1985). *See* Pa.R.Crim.P. 573; *See Commonwealth v. Burke*, 781 A.2d 1136 (2001) (prosecution's *Brady* obligation extends to exculpatory evidence in files of police agencies of the same government bringing the prosecution). *See Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(extended the prosecution's duty under *Brady* to discover and disclose to the accused favorable evidence known to the others acting on the government's behalf in the case, including the police). *See Brady v. Maryland*, 373 U.S. 83 (1963)(the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution).
[78]*Commonwealth v. Collins*, 888 A.2d 564, 578 (Pa. 2005); *citing: Commonwealth v. Morris*, 822 A.2d 684, 696 (Pa. 2003); *referencing: Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).
[79]*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), established an ongoing obligation to disclose exculpatory evidence. There is a "Brady" violation when there has been suppression by the prosecution of either exculpatory or impeachment evidence that was favorable to the accused, and the omission of such evidence prejudices the defendant.

the Commonwealth's assistance and therefore the evidence could have been properly admitted as rebuttal, although it was not.

Finally, it is significant that the primary reason Ms. Wilson was not pursued as a witness by the police was their concern that if Ms. Wilson was contacted, the identity and safety of the confidential informant might be compromised.

Taking into account the Defendant's ability to contact Ms. Wilson on his own, and the apparent nature of the friendship of Ms. Wilson and the Defendant, the Trial Court found that based on the circumstances, including: the danger of releasing an informant's identity; the public interest in resolving developing cases; and the nature of the information, the testimony could be offered as rebuttal, if appropriate. As set forth above, review of the introduction of evidence requires deference to the trial court's discretion. The Trial Court found that if the Defense presented testimony that he was not the perpetrator or the defense that another shooter committed the crime, then the Commonwealth should have had the opportunity to present Ms. Wilson as rebuttal evidence to impeach such testimony.

The Defendant also argues that the verdict was against the weight of evidence on each count including, Criminal Homicide,[80] Criminal Homicide, First Degree Murder;[81] Possession of Firearm Prohibited;[82] and Firearms Not to be Carried Without a License.[83]

Defendant filed Pre-Sentence Motions on November 21, 2013, petitioning the Court to grant his Motion Judgment of Acquittal or grant a Motion for a New Trial. The Defendant was

---

[80] 18 Pa.C.S. § 2501(a).
[81] 18 Pa.C.S. § 2502(a).
[82] 18 Pa.C.S. § 6105(a)(1).
[83] 18 Pa.C.S. § 6106 (a)(1).

sentenced on the above convictions on November 26, 2013.[84] The Trial Court submits that the verdict was supported by the weight of evidence.

The Trial Court is given considerable discretion when ruling on a Defendant's motion that the verdict is against the weight of the evidence.[85] "The Trial Court will award a new trial only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice."[86] Therefore, a trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.[87]

A motion for a new trial on the grounds that the verdict is against the weight of the evidence concedes that there is sufficient evidence to sustain the conviction.[88] The Pennsylvania Supreme Court stated:

> A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence, do not sit as the thirteenth juror. Rather the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.[89]

A challenge to the weight of the evidence is a matter of the Trial Court's sound discretion, appellate review of the determination is solely a question of whether the Trial Court abused its discretion, and does not reach the underlying question of whether the verdict was against the weight of the evidence.[90] The Superior Court of Pennsylvania has stated that "[d]iscretion is abused when the course pursued represents not merely an error of judgment, but

---

[84] Pa.R.Crim.P. 607. A claim that the verdict is against the weight of the evidence must be raised orally, on the record, at any time before sentencing, by written motion before sentencing, or in a post sentence motion.
[85] *Commonwealth v. Cousar*, 928 A.2d 1025, 1035-1036 (Pa. 2007).
[86] *Id.* at 1036.
[87] *Id.;citing Commonwealth v. Keaton*, 729 A.2d 529, 540-541 (Pa. 1999).
[88] *Commonwealth v. Whiteman*, 485 A.2d 459 (Pa.Super. 1984).
[89] *Commonwealth v. Widmer*, 744 A.2d 745, 751-752 (Pa. 2000).(internal citations omitted).
[90] *Id.* at 753; *citing Commonwealth v. Brown*, 648 A.2d at 1177 at 1189 (Pa. 1994).

where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias, or ill will."[91]

The evidence presented at trial, and as described above, overwhelmingly supported the verdict rendered by the jury. The Commonwealth's witnesses testified in a credible manner to the facts of the case. The Defendant, on the other hand, claimed in his defense that the allegations of his involvement in the shooting were unfounded. The defense put forth that the Defendant did not commit, plan or participate in the shooting. The Defense claimed the Defendant, while present at the scene, was not the person who committed the shooting. He argued that any surveillance video did not show him fleeing the scene. The Defense also argued that the eye witnesses' accounts were inaccurate. The jury justifiably rejected this defense. Simply put, based on the evidence elicited during trial, it would be impossible for the Trial Court to find the evidence was so contrary to the verdict as to shock the conscience of the Trial Court or to determine that the Defendant was denied justice.

The remaining issue raised in Defendant's Concise Statement of Matters Complained of on Appeal challenges the sufficiency of the record upon which the jury based its verdict. Defendant filed his Pre-Sentence Motions on November 21, 2013. The Trial Court filed an Opinion and Order denying Defendant's Post Sentence Motions on November 26, 2013.

The evidence presented in this case was sufficient to sustain the Defendant's conviction on all of the charges. A claim challenging the sufficiency of the evidence in a criminal case is a question of law requiring the reviewing court to determine whether all of the elements of the crimes charged were proven beyond a reasonable doubt.[92] In making this determination, this Court is required to review the entire record and view all of the evidence presented at trial in the

---

[91] *Id.* at 753.
[92] *Commonwealth v. Widmer,* 744 A.2d 745, 751 (Pa. 2000); *citing Commonwealth v. Karkaria,* 625 A.2d 1167 (Pa. 1993).

light most favorable to the verdict winner, the Commonwealth, and to give the Commonwealth the benefit of all reasonable inferences from the facts presented.[93]

"Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law."[94] However, it is *not* for the reviewing Court to determine the credibility of witnesses and the weight to be accorded to the evidence produced, as these are matters solely within the province of the trier of fact, who is free to believe all, some, or none of the evidence.[95]

From the testimony and evidence presented at trial, it was reasonable for the jury to believe that the Defendant committed Criminal Homicide in the First Degree of the victim. The bartender of Pickles bar, Amber Barrows, identified the man with the black T-shirt and red baseball hat on as the Defendant, Henry "Henny" Williams. Eye witness testimony and surveillance video indicated the Defendant was seen leaving the bar with the victim. It was also established that the Defendant and victim were standing alone in Pickles parking lot when witnesses heard three shots fired. Eye witnesses saw Defendant with a gun and their testimony also established the victim then grabbed his chest and fell to the ground, while flashes were seen from the shots fired. The Defendant then remained standing over the victim for a few moments before he fled through an alley, leaving his vehicle at the scene. A stolen Sturm Ruger handgun was recovered approximately a block away from Pickles bar later that day. It was determined that three rounds were fired from the recovered handgun and that the discharged bullet jackets and cartridge cases were fired from that gun.

---

[93] *Id.* at 751; *citing Commonwealth v. Chambers*, 599 A.2d 630 (Pa. 1991).
[94] *Id.*; *citing Commonwealth v. Santana*, 333 A.2d 876 (Pa. 1975).
[95] *Commonwealth v. McCalman*, 795 A.2d 412, 415 (Pa. Super. 2002); *citing Commonwealth v. Passarelli*, 789 A.2d 708, 716 (Pa. Super. 2001).

Likewise, the Court finds that the evidence presented at trial linking the Defendant to the handgun recovered was sufficient for the jury to convict Defendant of the charge of Possession of Firearms Prohibited and Firearms Not to be Carried without a License.

Accordingly, the Court asserts the testimony and evidence established the requisite elements of the crimes of Criminal Homicide,[96] Criminal Homicide, First Degree Murder;[97] Possession of Firearm Prohibited;[98] and Firearms Not to be Carried Without a License.[99]

For the reasons set forth above, the Trial Court respectfully submits that the verdict of the jury should be upheld, and that the Judgment of Sentence should be affirmed.

DATE:

7/2/14

BY THE COURT:

_____  J.
John F. DiSalle

---

[96] 18 Pa.C.S. § 2501(a).
[97] 18 Pa.C.S. § 2502(a)
[98] 18 Pa.C.S. § 6105(a)(1)
[99] 18 Pa.C.S. § 6106 (a)(1)

38